**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

| | | |
|---|---|---|
| RANDY BRANSON, | ) | |
| on Behalf of Himself and All | ) | |
| Others Similarly-Situated, | ) | **PROPOSED COLLECTIVE ACTION** |
| | ) | **UNDER FLSA AND CLASS ACTION** |
| *Plaintiff,* | ) | **UNDER KWHA** |
| | ) | |
| | ) | CASE NO.   4:19-CV-155-JHM |
| v. | ) | |
| | ) | |
| ALLIANCE COAL, LLC, and | ) | **JURY DEMANDED** |
| WEBSTER COUNTY COAL, LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**COMPLAINT**

Comes Plaintiff Randy Branson, by and through counsel, and, on behalf of himself and all

others similarly-situated, brings this action as both a collective action pursuant to the Fair Labor

Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA") and a class action under the Kentucky Wages

and Hours Act ("KWHA") against Defendants Alliance Coal, LLC and Webster County Coal,

LLC.

**Summary of the Action**

1.      Defendant Alliance Coal, LLC is a parent company of, and owns, Defendant

Webster County Coal, LLC.  The Defendants operated in the last five years the Dotiki coal mine

in Webster County, Kentucky, at which several hundred coal miners worked from 1969 until the

mine was closed in September, 2019.  Defendant Alliance Coal, LLC, through and as a joint

employer with other subsidiaries,[1] operates other mines in the Commonwealth of Kentucky and in

_____

[1]      Specifically, Plaintiff asserts that employees of (1) River View Coal, LLC, (2) Warrior Coal, LLC, (3) Sebree
Mining, LLC, (4) Hopkins County Coal, LLC, and (5) Excel Mining, LLC (all located in Kentucky) were similarly
deprived of pay by Defendant Alliance Coal, LLC and are similarly-situated with respect to Plaintiff's claims against

Indiana, Illinois, West Virginia and Maryland.  Defendants assert that they employed 3,212 employees in mining operations as of December, 2018.

2.      Defendants systematically and willfully failed to comply with the requirements of the FLSA and KWHA in at least four ways.

3.      First, Defendants required Plaintiff and similarly-situated workers to report to work before their scheduled shift, but only paid the workers for time worked after the scheduled beginning of the shift.  Defendants illegally failed to pay for this "off-the-clock" work performed prior to the scheduled beginning of the shift.

4.      Second, Defendants systematically and willfully failed to pay Plaintiff and similarly-situated employees the correct overtime rate of pay: instead of including an hourly amount on account of promised bonus compensation with each employee's hourly rate of pay as required by law before multiplying by 1.5 to arrive at the employee's overtime rate of pay, Defendants illegally pretended as if the employees did not receive that bonus compensation in calculating the overtime rate of pay.

5.      Third, Defendants paid substantial weekly productions.  These bonuses were based on non-discretionary formulas.  Therefore, Defendants were required to pay overtime bonus rates (1.5 times the bonus accrued for non-overtime hours) for employees' overtime worked.  Indeed,

---

Alliance Coal, LLC under both the Kentucky Wages and Hours Act and the Fair Labor Standards Act.  Employees of other subsidiaries worked at facilities outside Kentucky (at (6) the Hamilton County Coal mine in Hamilton County, Illinois operated by Hamilton County Coal, LLC, (7) the Gibson South mine and Gibson North mine in Gibson County, Indiana operated by Gibson County Coal, LLC, (8) the Mount Vernon Transfer Terminal at Mount Vernon, Indiana, operated by Mount Vernon Transfer Terminal, LLC, (9) the Tunnel Ridge Mine located near Wheeling, West Virginia, operated by Tunnel Ridge, LLC, and (10) the Mountain View mine, located in Tucker County, West Virginia operated by Mettiki Coal (WV), LLC), were similarly deprived of pay by Defendant Alliance Coal, LLC, and are similarly-situated with respect to Plaintiff's claims against Alliance Coal, LLC under the Fair Labor Standards Act.  Defendant Alliance Coal, LLC was a joint employer under the FLSA with each of these subsidiaries with respect to the employees of each of these subsidiaries, and is thus liable for the illegal acts with respect to the employees of these subsidiaries. Plaintiff is providing notice of this action to each of these subsidiaries, and intends to amend this complaint to add claims (under the FLSA and, if applicable, KWHA, corresponding to the equivalent claims herein raised by Plaintiff against Defendant Webster County Coal, LLC) against each Alliance Coal, LLC subsidiary when an employee of that subsidiary joins this action.

to Plaintiff's current understanding, the formula included the equivalent of an overtime premium by paying each employee 1.5 times as much bonus compensation for the overtime hours Defendants credited the employees with having worked as Defendants paid in bonus compensation for non-overtime hours worked.  However, because Defendants illegally did not credit employees with working off the clock, Defendant illegally failed to fully compensate employees for their overtime work in calculating the amount of the production bonuses.

6.     Finally, Defendants sometimes paid overtime rates of pay that were less than 1.5 times the applicable employee's hourly rate of pay (i.e., the "base" rate even before accounting for nondiscretionary bonuses), illegally shaving a few dollars off the overtime pay of employees here and there.  Notably, Defendants did not make equivalent errors in the employers' favor; the "errors" always benefitted Defendants.  While this appears at first glance to be bizarre and petty, when multiplied by Defendants 3,200+ employees, and over the course of years, this practice amounted to hundreds of thousands if not millions of dollars of illegally-unpaid overtime compensation.

7.     These illegal practices by Defendants were systematically applied by Defendants to workers at the Dotiki mine, and systematically applied by Defendant Alliance Coal to workers at its other subsidiaries' other mines.  Defendants should pay the wages illegally withheld from their employees.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the claims of Plaintiff and those similarly-situated pursuant to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b).

9.     This Court has and should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims under the KWHA because they are so related to Plaintiff's claims

under the FLSA that they form part of the same case or controversy and arise from the same set of operative facts as Plaintiff's claims under the FLSA.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because:

    a.  Defendants employed Plaintiff and the other employees who worked at the Dotiki mine within the District of this Court and, specifically, in Webster County, Kentucky;

    b.  Five of the six mines operated by the Defendants in the Commonwealth of Kentucky are located in the Western District of Kentucky (specifically, Webster County Coal, LLC operates the Dotiki Mine in Webster County, Kentucky, River View Coal, LLC operates the River View Mine in Union County, Kentucky, Warrior Coal operates the Warrior Mine in Hopkins County, Kentucky, Sebree Mining, LLC operated the Onton No. 9 Mine in Webster County, Kentucky, and Hopkins County Coal, LLC operated the Elk Creek Mine in Hopkins County, Kentucky); and

    c.  Six of the eleven mines operated by Defendant Alliance Coal are located in the Commonwealth of Kentucky.

## PARTIES

11.     Plaintiff is a resident of Webster County, Kentucky.

12.     Defendant Webster County Coal, LLC is a for-profit limited liability company organized under the laws of this state of Delaware, with its stated-by-Defendant principal place of business being 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886; upon information and belief Defendant Webster County, LLC may be served by service of process on its registered agent

for service of process in the Commonwealth of Kentucky which is Cogency Global, Inc., at 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

13.     Defendant Alliance Coal, LLC is a for-profit limited liability company organized under the laws of this state of Delaware, with its stated-by-Defendant principal place of business being located at 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886; upon information and belief Defendant Alliance Coal, LLC may be served by service of process on its registered agent for service of process in the Commonwealth of Kentucky at Cogency Global, Inc. 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

14.     To the extent the holding of *Bristol Myers Squib vs. Superior Court*, 137 S.C.t. 1773 (2017) applies to federal actions and, particularly, collective actions under 29 U.S.C. § 216(b),[2] this Court may appropriately proceed against Defendant Alliance Coal, LLC with respect to its actions in other states because Defendant Alliance Coal, LLC is fully "at home" in the Commonwealth of Kentucky.

15.     Specifically, of the 40.3 million tons of coal which Defendants indicate that they mined in 2018 from nine then-active mines,[3] more coal by far was mined in Kentucky than in any other state: 17.1 million tons of coal was mined from the Commonwealth of Kentucky, 9.1 million tons of coal was mined in West Virginia, 6.3 million tons of coal was mined in Illinois, and 7.8 million tons was mined in Indiana.  See Defendants' Illinois Basin and Appalachia pages from Defendants' website, attached hereto as Exhibits 1 and 2.

---

[2]     Lower courts are divided on this question and the question has not been addressed by the United States Supreme Court or any United States Court of Appeals.  Plaintiff contends that *Bristol Myers Squib*, which involved a state-court proceeding, was not intended to apply, and does not apply, to federal court actions of the type brought here.

[3]     Six of the eleven mines operated by Defendant Alliance Coal in the last three years are located in the Commonwealth of Kentucky.  See Paragraph 10 above.

16.     Defendant Alliance Coal maintains an office in Lexington, Kentucky which, upon information and belief, surpasses Defendants' supposed headquarters in Tulsa, Oklahoma in terms of each of number of employees, square footage, oversight of actual mining operations (the focus of Defendant Alliance Coal, LLC as opposed to the financing focus of Alliance Coal, LLC's parent company Alliance Resource Partners, LP, which shares the Tulsa, Oklahoma office) and overall activity.

17.     Indeed, Defendants' own website, at the "Contact Us" page, reflects that "Alliance Coal, LLC" is located at the "Lexington Office" in Lexington, Kentucky whereas "Alliance Resource Partners, LP" is located at "ARLP Headquarters" in Tulsa, Oklahoma.  See "Contact Us" page, a copy which is attached hereto as Exhibit 3.

18.     Upon information and belief, the majority of Defendant Alliance Coal, LLC's employees and the employees of its subsidiaries are employed in the Commonwealth of Kentucky. In the alternative, upon information and belief, vastly more employees of Defendant Alliance Coal, LLC's employees and the employees of its subsidiaries are employed in the Commonwealth of Kentucky than are employed in any other state.

19.     Defendants Alliance Coal, LLC and Webster County Coal, LLC jointly employed Plaintiff; Defendants as well as Alliance Coal, LLC's other subsidiaries operating mines employ employees similarly-situated to Plaintiff.

20.     Defendant Webster County Coal, LLC is a wholly-owned subsidiary of Alliance Coal, LLC and employs its employees in accordance with policies that are uniformly established and directed by Defendant Alliance Coal, LLC.

21.     Upon information and belief, each other subsidiary of Alliance Coal, LLC is a wholly-owned subsidiary of Alliance Coal, LLC and employs its employees in accordance with policies that are uniformly established and directed by Defendant Alliance Coal, LLC.

22.     Upon information and belief, Alliance Coal, LLC exerts supervisory control over all employees (including Plaintiff) of its subsidiaries, including Defendant Webster County Coal, LLC, and was and is involved in the daily operations of the business of the subsidiaries as it pertains to the employment of all such employees; for instance, Alliance Coal, LLC has created one omnibus "Benefits Handbook" applicable to its subsidiaries, and requires all of its subsidiaries to pay employees benefits in accordance with the handbook (but not pay the employees commensurate additional overtime compensation required due to the required inclusion of such benefits in calculating employees' overtime rates of pay).

23.     In the last five years  (and also in the last three years), Defendants have employed in their mines in non-exempt positions Plaintiff[4] and many other similarly-situated current and former employees.

24.     Each Defendants' annual sales, have at all times relevant to this Complaint exceeded $500,000.00.  Indeed, Defendants have boasted that they have vastly higher sales. Specifically, Defendants assert that alone in 2018 sold 2.5 million tons of coal from the Dotiki Mine, 9.8 million tons of coal from the River View Mine, 3.5 million tons of coal from the Warrior Mine, and 1.3 million tons of coal from the MC Mining Mine.  See Illinois Basin page from Defendants' website, attached hereto as Exhibit 1 and Appalachia page from Defendants' website,

---

[4]     Plaintiff worked in the Dotiki mine operated by Defendants.

attached hereto as Exhibit 2.  At an average rate of $43.75 per ton[5], the 2.5 million tons of coal produced by the Dotiki mine was valued at $109,375,000.00 and the 17.1 million tons of coal produced by the employees of these mines in the Commonwealth of Kentucky was valued at $748,125,000.00.

25.     Each Defendant is an enterprise engaged in commerce or in the goods for commerce, or in the production of goods for commerce, as defined in 29 U.S.C. § 203.

## FACTUAL ALLEGATIONS

### Defendants Require "Off-The-Clock" Work Prior To Scheduled Shifts

26.     Plaintiff was regularly scheduled to work shifts at the Dotiki Mine.

27.     Defendants directed Plaintiff and other employees of the Dotiki mine to arrive at the Dotiki Mine and be "dressed out" fifteen minutes prior to the beginning of his scheduled shift.

28.     However, Defendants never paid Plaintiff for the time between when he was required to arrive (prior to fifteen minutes before his scheduled shift) and the scheduled beginning of his shift.

29.     Instead, Defendants only began paying Plaintiff for his work at the scheduled beginning at his shift.

30.     Because Defendants required Plaintiff to be present at their facility for Defendants' convenience to be ready to work at Defendants' request, Plaintiff was, at the very least, "engaged to wait" during those fifteen minutes and therefore should have been compensated for those fifteen minutes as compensable work, even if Plaintiff did absolutely nothing during that time.

---

[5]     This is the rate per ton of coal which is published by the United States Energy Information Administration. See Average Sales Price of Coal by State and Coal Rank, 2018, attached hereto as Exhibit 4 (also available online at https://www.eia.gov/coal/annual/pdf/table31.pdf) (last checked October 30, 2019).

31.     However, during the time that Plaintiff was required to be present at the Dotiki Mine prior to the scheduled beginning of his shift, Plaintiff performed a variety of activities that constituted compensable work, including the following:

(a)     "Donning" specialized protective equipment required for the dangerous environment of an underground coal mine, including boots, helmet, gloves, and clothing issued by Defendant;[6]

(b)     Gathering tools to be used during Plaintiff's scheduled shift; and

(c)     Gathering materials to be used during Plaintiff's scheduled shift.

32.     Defendant previously had signs posted at the Dotiki Mine specifically stating that employees were required to be at the mine fifteen minutes before their scheduled shift.

33.     Upon information and belief, within the last three years, or, in the alternative, within the last five years, Defendant removed these signs because Defendant was concerned that these signs could be used in an action such as this one[7] to establish that Defendant did in fact have a policy up of requiring employees to be present fifteen minutes before the schedule beginning of their shift, but did not pay employees for this compensable time.

34.     At all times, including both before and after the removal of the signs as noted above, Defendants were aware that they were required to pay employees for the fifteen minutes prior to the scheduled beginning of the shift.

---

[6]     Because Defendants' policy was that employees were required to be "dressed out" fifteen minutes before their scheduled shifts, this "donning" work, which itself required minutes and was necessarily performed at Defendants' facility because employees were prohibited from taking their clothing and equipment home, was in addition to the fifteen minutes of other work prior to the scheduled beginning of a shift.

[7]     Although Defendants knew when they removed the signs (at the very latest) that the policy of requiring employees to report early violated the FLSA because employees were not being paid overtime pay for that time, Defendants did not cause overtime to be paid or correct their policy at the time the signs were removed; Defendants simply chose to continue to violate the FLSA, demonstrating the willfulness of their violations.

35.     At all times, including both before and after the removal of the signs as noted above, Defendants were aware that employees were in fact reporting to work so as to be "dressed out" fifteen minutes prior to the scheduled beginning of the shift and performing work during those fifteen minutes.

36.     Defendants have numerous cameras in the above-ground section of the mine that capture and store video images of employees arriving at each mine prior to the scheduled beginning of their shift and performing work (or, at the very least, being present and prepared to perform work at Defendants' request) prior to the scheduled beginning of their shift.

37.     Upon information and belief, the video footage is of sufficient quality to allow the viewer to recognize individual employees and determine when each individual employee arrived and began performing work for Defendant Alliance Coal, LLC and its applicable subsidiary.

38.     Defendants should maintain all video footage that Defendants have at the time of their receipt of this Complaint (and Defendant Alliance Coal, LLC should maintain all video footage that its other subsidiaries operating mines other than the Dotiki mine have) so that the jury may determine whether the allegations in this Complaint are supported by that video footage.

39.     However, Defendant never paid any of the employees for their time expended in compensable activities prior to the scheduled beginning of the shift; instead, Defendants paid Plaintiff and those similarly-situated only when the scheduled beginning of the shift began.

## Defendants Do Not Take Into Account Bonus Compensation As Required By Law In Calculating Employees' Overtime Rates of Pay

40.     In addition to not paying employees for time which should have been compensated prior to the scheduled beginning of employees' shifts (as discussed above), Defendants also did not pay Plaintiff and those similarly-situated the appropriate overtime rate of compensation for employees' overtime work.

41.     Federal law requires that bonus compensation promised to an employee for working for a particular period of time must be included in determining the "regular rate" of compensation for an employee, which is in turn the basis for determining the appropriate rate of overtime compensation for overtime work.

42.     Specifically, 29 U.S.C. § 207(a) prohibits employment of non-exempt employees beyond forty hours in a work week "unless such an employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

43.     29 U.S.C. § 207(e) in turn defines the term "regular rate" by stating that "the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee."

44.     29 U.S.C. § 207(e)(3) provides an exception for discretionary bonuses to the rule that all remuneration should be included in the regular rate.

45.     However, none of the bonuses paid by Defendants qualify as discretionary bonuses under that subsection because that subsection requires that for such bonuses, the bonus is only eligible for exclusion from the regular rate if "both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement or promise causing the employee to expect such payments regularly."

46.     Indeed, 29 C.F.R. § 778.211(c) specifically provides that "*Promised bonuses not excluded.* The bonus, to be excluded under section 7(e)(3)(a), must not be paid 'pursuant to any prior contract, agreement, or promise.'  For example, any bonus which is promised to employees

upon hiring or which is the result of collective bargaining would not be excluded from the regular rate under this provision of the Act."

47.     Plaintiff and those similarly-situated were paid several forms of bonus compensation which were not discretionary and which should have been included in such employees' "regular rate" of compensation in determining such employees' overtime rate of compensation.

48.     Specifically, Defendants provided Plaintiff with a "Benefits Handbook" which described certain bonus compensation to which Plaintiff would be entitled as part of Plaintiff's compensation for his work for Defendants.

49.     A copy of a "Benefits Handbook" similar to that provided to Plaintiff, and which was provided by Defendants to another employee of the Dotiki mine, is attached hereto as Exhibit 5.

50.     The Benefits Handbook described certain bonuses which Plaintiff and the similarly-situated employees were promised and thus caused to expect regularly, including the following bonus payments as described by the Benefits Handbook as follows:

**Attendance Incentive Bonus**

An employee achieving attendance benchmarks for working without the incurrence of absences (other than paid vacation, paid personal, paid bereavement leave, safety day, or jury duty or court-ordered appearance) will receive a bonus of fifty dollars ($50.00), which will increase annually but fifty dollars ($50.00) for each subsequent and consecutive year in which subsequent attendance benchmarks are reached, with no maximum limit.  The time period for calculating whether an employee qualifies for an attendance incentive bonus shall begin each year on December 1st and end on November 30th of the following year.

The attendance incentive bonus is generally paid during the month of December.

Any break in service to the Company or incurrence of non-paid absence from regularly scheduled work shall result in an employee's attendance incentive bonus being reset to zero dollars ($0.00).  However, temporary shutdowns of your location

due to mining conditions or equipment issues beyond employee control shall not be considered a break in service for the purpose of calculating consecutive years of eligibility.

The Company reserves the right to change the qualifications for the Attendance Incentive Bonus at any time, as well as determine the eligibility and qualifying achievement of those who may receive the Attendance Incentive Bonus.

…

**New Electrical Certification Bonus**

For obtaining a State or Federal Electrical Certification, an employee may be eligible for a one-time (for each locally applicable jurisdiction) bonus of five hundred dollars ($500.00), along with reimbursement of limited out-of-pocket expenses approved by the Company.  To qualify for this bonus, an employee must not have been paid for time necessary to obtain the certification.  Additionally, you must be employed by your (or a participating) employer on the day the bonus is distributed.  The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the New Electrical Certification Bonus.

**New Mine Foreman Certification Bonus**

For obtaining a new Mine Foreman Certification, you may be eligible for a New Mine Foreman Certification Bonus of five hundred dollars ($500.00), as well as a reimbursement of limited out-of-pocket expenses.  The New Mine Foreman Certification Bonus is offered as a one-time bonus for each state in which an employee obtains Mine Foreman Certification for the first time.  Additionally, to be eligible an employee must not have been paid for the time necessary to obtain the certification.  Additionally, you must be employed by your (or a participating) employer on the day the bonus is distributed.  The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the new Mine Foreman Certification Bonus.

**Emergency Medical Technician (EMT) Certification Bonus**

For obtaining an Emergency Medical Technician (EMT) certification, an employee is eligible to receive an Emergency Medical Technician Bonus of one thousand dollars ($1,000.00), as well as reimbursement of limited out-of-pocket expenses. Additionally, employees certified as an Emergency Medical Technician are eligible to receive one thousand dollar ($1,000.00) bonus annually for so long as the certification remains current and the employee remains an employee of the Company on the day the bonus is distributed.  The amount of an Emergency Medical Technician Bonus may be prorated, for a calendar year, if the individual receiving the bonus is certified for less than the full calendar year for which the

bonus is being paid.  The Emergency Medical Technician Bonus generally will be paid in December.

The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the Emergency Medical Technician Certification Bonus.

### Mine Emergency Technician (MET) Certification Bonus

For obtaining a Mine Emergency Technician (MET) certification, an employee is eligible to receive a Mine Emergency Technician Bonus of three hundred fifty ($350.00), as well as reimbursement of limited out-of-pocket expenses. Additionally, employees certified as a MET are eligible to receive a three hundred fifty dollar ($350.00) bonus annually for so long as the certification remains current and the employee remains an employee of the Company on the day the bonus is distributed.  The amount of a Mine Emergency Technician Bonus may be prorated, for a calendar year, if the individual receiving the bonus is certified for less than the full calendar year for which the bonus is being paid.  The Mine Emergency Technician Bonus generally will be paid in December.

The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the Mine Emergency Technician Certification Bonus.

An employee who receives an EMT bonus is not eligible for an MET bonus.

See Exhibit 5 at 154 (PDF Page 153)[8] and 155-156 (PDF Pages 154-155).

51.     Defendants paid these bonuses to Plaintiff [9] and other similarly-situated employees, but did not include them in the "regular rate" used to calculate the overtime rate of pay for Plaintiff and the similarly-situated employees.

---

[8]      Page 69 of the Benefits Handbook, which information and belief contained the remainder of "Appendix C; Services and Products that Require Preauthorization" that begins on page 68 (and is irrelevant to the bonuses complained of herein).

[9]      Plaintiff received the Attendance Incentive Bonus and the Mine Emergency Technician (MET) Certification Bonus.  See, *e.g.*, Exhibit 6 at 80 (Defendant's December 28, 2107 paystub).   Although Plaintiff did not receive the EMT, Mine Foreman, or Electrical Certification bonuses, they are of an almost identical type to the MET Bonus which Plaintiff did receive because they all similarly compensate employees for certifications and education which benefits Defendant through the employee's work (and, indeed, paystub entries reflecting payment of Plaintiff's MET bonus shows this payment under the entry "EMT/MET Bonus," *see id.*).  Accordingly, Plaintiff asserts that employees who received any of these type of bonuses are similarly-situated to Plaintiff because all of these types of bonuses should have been included in the regular rate in calculating the overtime rate of pay.

52.     In addition to the bonuses described above, the Benefits Handbook provided that "each full time employee will receive a bonus equivalent to forty (40) hours of regular pay, which is generally paid in December prior to Christmas.  Each full time hourly employee will receive forty (40) hours multiplied by the employees' regular base rate of pay…for employees less than one year of service, the bonus will be prorated.  In order to receive the five days paid bonus, an employee must still be employed by the company the date the bonus is distributed." Exhibit 5 at 154-155 (PDF Pages 153-154)

53.     Further, the Benefits Handbook promised Plaintiff and each other similarly-situated employee that "the seniority days bonus is paid to full time employees every December, starting their sixth year of service.  The amount of the bonus is based on an accrual of seniority days at a rate of one day for each year after five years of service.  For hourly employees the bonuses equal to eight hours multiplied by the employees' regular based rate for each seniority day they have accrued…for all eligible employees the maximum number of seniority days accrual is the greater of one twenty days or two seniority days that you accrued and were paid in 2016.  To be eligible you must be employed with a participating employer on the day the bonus is distributed….to be eligible for seniority days bonus you must be employed with your employer on the day the bonus is distributed." Exhibit 5 at 155 (PDG Page 154).

54.     The Seniority Days Bonus and the Five Days Bonus should have been included in calculating employees' overtime rates of pay.

55.     Specifically, in addition to not qualifying for exclusion from the regular rate as discretionary bonuses under 29 U.S.C. § 207(e)(1), the bonuses were not "paid as gifts" or "payments in the nature of gifts made at Christmastime or on other special occasions," and, therefore, were not excludible from the "regular rate" under 26 U.S.C. § 207(e)(1).

56.     Indeed, under Kentucky law, the employees had a legal right to the payment of the portion of such bonuses accrued prior to such time as the employer informed the employees that the employer was prospectively terminating the bonus plan (which Defendants never did).

57.     Specifically, while the Benefits Handbook provided that "the company reserves the right to amend or terminate any benefit plan at any time and for any reason without the consent of any employer or other party" (see Exhibit 5 at 2) and also provided with respect to the "Special Benefits" that "policies, procedures, and rules are subject to change at any time" and that "management reserves the right to modify any benefit at any time," (see Exhibit 5at 147 (PDF Page 146), the Benefits Handbook was ambiguous as to whether management was reserving the right only to prospectively amend or terminate the benefits described herein, or the right to both prospectively and retroactively (in other words, after the employees had earned rights to benefits) terminate the benefit.

58.     Under these circumstances, and, as Defendants were the drafters of the document containing this ambiguity (and accordingly, the ambiguity would under state law be construed against Defendants), each employee was entitled to the bonuses described in the benefits guide; in other words, each employee had a legal right to the payment of the benefits described therein and could bring suit to enforce those benefits.  Therefore, the payments were not in the nature of a gift.

59.     Notably, the benefits guide did not anywhere disclaim that a contract was being created thereunder under which employees could expect to be able to accrue benefits as described in the benefits guide until such time as management informed the employees that it was prospectively terminating those benefits.

60.     Indeed, under the factual circumstances, if Defendants were to have announce in December of any year, after Plaintiff and similarly-situated employees had worked all year under

the understanding that they would receive the Five-Day Pay Bonus and Seniority Days Bonus, that Defendant did not intend to honor or pay those Bonuses because it was "terminating" the bonuses not only for the future year, but for the year already worked, Plaintiff and the similarly-situated employees would have been legally entitled to sue for and recover the Bonuses already earned;[10] therefore, the bonuses should have been included in calculating overtime rates of pay.

61.   Defendants did not include these bonuses in calculating the overtime rate of pay of Plaintiff and the similarly-situated employees; Defendants paid the Plaintiff and the similarly-situated employees, at most, exactly 1.5 times the employees' hourly rate of pay as the overtime rate of compensation.

62.   Had the Defendants appropriately included the bonus compensation in the employees' "regular rate" of pay for purposes of calculating the employees' overtime rate of pay, Plaintiff and the other similarly-situated employees would have received substantially higher rates of pay.

---

[10]   *See e.g., Secretary of the United States Department of Labor v. Bristol Excavating, Inc.*, ___ F. 3d. ___ (3rd Cir. August 20, 2019) ("One can imagine a circumstance in which an employer tries to pressure an employee to accept remuneration from a third party so as to artificially suppress on paper what the employer and employee both regard as the regular rate of pay. Such a manipulation would also occur if an employer tried to categorize a portion of what was a base pay as instead being a bonus. The parties' true agreement is what should matter, not labels. *See Youngerman-Reynolds Hardwood* 325 U.S. At 424 ('[The regular rate] is not an arbitrary label chosen by the parties; it is an actual fact.' This is not only a matter of common law, but also of common sense…As for common sense, we cite no less an authority than Clark W. Griswold. In the classic movie *National Lampoon's Christmas Vacation*, the plot revolves around Clark's anxious anticipation of his Christmas bonus. *See* National Lampoon's Christmas Vacation (Warner Bros. 1989) (Really, you should see it.). When the regular bonus does not arrive and instead Clark receives a jelly-of-the-month club membership, he berates his boss, saying, 'Seventeen years with the company, I've gotten a Christmas bonus every year but this one. You don't want to give bonuses, fine. But when people count on them as a part of their salary, well[.]' *Id.* Unlike the Christmas lights on his house, Clark doesn't seem to be overly bright but he at least understands how a course of dealing can lead to an expectation that could be viewed as a meeting of the minds about remuneration for employment. In other words, it is common sense that labels alone do not control. And, of course, the required agreement between employer and employee need not be explicit. It may be implied through an employer's significantly facilitating regular compensation that reaches the employee.")

63.     Defendants should be made to pay the overtime compensation which they should have paid, but did not pay because they used an erroneous lower-than-legally-required overtime rate of compensation.

**Defendants Failed To Appropriately Calculate The Overtime Premium Due To Employees In Connection With Their Substantial Weekly Production Bonuses**

64.     In addition to the bonuses describe above, Defendants' Benefits Handbook promised that "a weekly production bonus is paid to employees based on productivity and manhours.  See local management for details about the production bonus, including who is eligible and how it is calculated."

65.     The Benefits Handbook did not state in any way that the production bonus was tied or "calculated" in any way based on the Defendants' discretion.

66.     Indeed, a formula was used by each Defendant to calculate the production bonus of employees.

67.     The formula was made known by each Defendant to its employees.

68.     The formula was based upon empirical facts, and, therefore, a third party could, by reviewing the formula and the facts referenced therein, compute the amount of production bonus to which each employee was entitled.

69.     For instance, the formula took into account the amount of coal mined during the week in the mine in question, the percentage of the coal mined which was "clean," the number of employer hours expended to mine the coal, and similar objectively-quantifiable facts.

70.     The bonus was therefore not eligible as a discretionary bonus to be excluded from the "regular" rate under 29 U.S.C. § 207(e)(3), and additional overtime compensation had to be paid relating to the production bonus.

71.     Based on the information Plaintiff has received to date, it appears that Defendants partially compensated employees for their overtime work by including within the weekly production bonus formula that hours which Defendants credited each employee with having worked in excess of forty hours per week were treated as entitling the employee to 1.5 times the amount of weekly production bonus as hours worked less than forty hours per week.

72.     However, that formula did not entirely compensate employees for the overtime work they performed because employees were not paid for all of their overtime work and the weekly production bonuses were only based on the hours of work for which Defendants credited the employees; Defendants' formula illegally did not take into account the off-the-clock work performed prior to the scheduled beginning of the shift as described in paragraphs 26 through 39 above.

73.     Upon information and belief, the "Safety Incentive Bonus" (see Exhibit 5 at 154 (PDF Page 153)) was, like the weekly production bonuses, calculated based on empirical facts, and included an implicit overtime premium, but did not fully compensate Plaintiff and the similarly-situated employees because it did not account for the employees' off-the-clock work.

74.     To illustrate the fact that bonuses were paid to Plaintiff but not incorporated by Defendants in calculating the overtime rates of payment, attached hereto as Exhibit 6 are pay stubs of Plaintiff from November 1, 2014 until the present.  For example, Plaintiff's paystub dated December 28, 2017 (Page 80 of Exhibit 6) shows that Plaintiff received in 2017 $350.00 in MET bonus, $976.80 in Five Day Bonus, $1,172.16 in Seniority  Days Bonus, $250.00 in Attendance Award, $1,24.86 in Safety Bonus, and $9,979.65 in Weekly Production Bonus

**Defendants Fail To Pay Even One-and-One-Half Times Employees' Hourly Rate Of Pay For Overtime Work In Certain Pay Periods**

75.     Bizarrely, in addition to failing to comply with the FLSA and KWHA in the manners described above, Defendants brazenly violated the most fundamental requirement of those statutes.

76.     Specifically, on many pay periods, Defendants would show the number of hours which Defendants credited the employee with having worked, would show the amount earned by the employee for having worked forty non overtime hours in the week, and would show the amount being paid for overtime pay.

77.     Amazingly, the rate of overtime pay would often be slightly less than 1.5 half times the regular hourly rate.

78.     For example, Plaintiff's paystub for the period beginning December 11, 2017 and ending December 17, 2017 is page 80 of Exhibit 6.

79.     During this one-week pay period, the paystub reflects that Defendants credited Plaintiff with having worked 56.00 hours.

80.     Defendants reflected on that paystub that Plaintiff had earned $988.80 in regular wages.

81.     Further, the paystub reflects that Plaintiff was paid $589.68 for overtime pay.

82.     Basic math indicates that Defendants underpaid Plaintiff in the amount of $3.60 for this period, even if it is assumed that Plaintiff worked only 56.00 hours during this period[11] and that no bonus or other compensation other than the regular wages should be taken into account in determining the overtime rate of compensation.

---

[11]        In other words, assuming Plaintiff performed no off-the-clock work.

83.  Specifically, when one divides the regular hourly wages of $988.80 by 40 hours, Plaintiff is being paid $24.72 on this paystub for Plaintiff's non-overtime work.

84.  However, while 1.5 times $24.72 per hour is a simple mathematical formula (specifically, it is $37.08 per hour), Defendant did not pay Plaintiff 1.5 times the hourly rate on this paystub.

85.  Specifically, when one divides the $589.68 shown on this paystub as having been paid for overtime pay by the 16.00 hours of overtime work this paystub shows as having been worked during this period, it is apparent that Defendants only paid Plaintiff approximately $36.855 per hour for his overtime work during this period, which amounts to approximately 1.490898 times his hourly rate of pay.

86.  If Defendants had paid Plaintiff 1.5 times his hourly rate for the 16.00 hours of overtime work reflected on this paystub, they would have paid Plaintiff $593.28 ($37.08 times 22.25).

87.  However, with no explanation whatsoever, Defendants paid Plaintiff only $589.68 during this pay period.

88.  As a result, Defendants underpaid Plaintiff $3.60 ($589.68-$593.28) even if all of the other violations described above are disregarded.

89.  The violations shown on the paystub for the week of December 11, 2017 through December 17, 2017 (Page 80 of Exhibit 6) were not isolated violations (see, e.g., paystub for week beginning October 2, 2017, page 64 of Exhibit 6 ($3.31 underpaid in one-week period); while Defendants did not always do so, Defendants regularly and systematically underpaid Plaintiff by paying Plaintiff amounts slightly less than 1.5 times his hourly rate for overtime hours worked.

90.     Tellingly, Defendants never paid Plaintiff slightly more than 1.5 times his hourly rate for overtime hours worked.

91.     Upon information and belief, the slight underpayment in some work weeks was a systematic and willful violation by Defendants of Defendants' obligation to pay 1.5 times the non-overtime rate of pay for overtime worked performed.

92.     Upon information and belief, Defendants, by underpaying employees in small amounts, saved large amounts of money over the course of time and over the course of taking similar amounts from their thousands of other similarly-situated employees.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

93.     Plaintiff brings this action under the FLSA on behalf of himself and all similarly-situated current and former employees of Defendants who worked for Defendants and were not fully-paid for their overtime work which Defendants should have paid within the last three years.

94.     Stated another way, Plaintiff seeks to bring this action as a collective action under the FLSA against Defendant Alliance Coal, LLC[12] on behalf of the following persons:

> all current and former employees of any Alliance Coal, LLC subsidiary[13] who were not fully-paid since November 2, 2016 for all overtime compensation due for such employee's work in one or more workweeks because Defendant did not pay the employee (1) for time worked (or for reporting to work as requested by Defendants to be available to work) prior to scheduled shifts, or (2) overtime compensation due on account of bonus compensation, or (3) the full overtime rate of pay.

95.     The employment policies, practices and agreements of Defendants raise questions of fact common to the proposed collective group including:

---

[12]     The Claims against Defendant Webster County Coal are brought on behalf of Plaintiff and the sub-group of the group described in the text who worked for Defendant Webster County Coal, LLC.

[13]     The term "Alliance Coal, LLC Subsidiary" includes each of the following:  (1) River View Coal, LLC, (2) Warrior Coal, LLC, (3) Sebree Mining, LLC, (4) Hopkins County Coal, LLC, (5) Excel Mining, LLC, (6) Hamilton County Coal, LLC, (7) Gibson County Coal, LLC, (8) Mt. Vernon Transfer Terminal, LLC, (9) Tunnel Ridge, LLC, and (10) Mettiki Coal (WV), LLC.

      a.      whether Defendant has engaged in a pattern or practice of permitting or requiring Plaintiff and members of the proposed collective group to work in excess of forty hours per workweek for the benefit of Defendant and without appropriate compensation, in violation of the FLSA;

      b.      whether Defendant has engaged in a pattern or practice of failing to keep accurate records showing all hours worked by Plaintiff and members of the proposed collective group, in violation of the FLSA;

      c.      whether the conduct of Defendant was willful;

      d.      whether Plaintiff and members of the proposed collective group are entitled to lost wages, liquidated damages and the other relief requested.

96.      The claims of Plaintiff are similar to those of the members of the proposed collective group, in that Plaintiff has been subject to the same conduct as members of the proposed collective group and Plaintiff's claims are based on the same legal theory as members of the collective group.

97.      Plaintiff's FLSA claims are maintainable as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).  Plaintiff's consent to join this action is attached hereto as Exhibit 7.

**CLASS ACTION ALLEGATIONS RELATING TO DEFENDANTS' VIOLATION OF THE KWHA PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23**

98.      Plaintiff brings this action under the KWHA on behalf of himself and all similarly-situated current and former employees of Defendants who worked for Defendants and were not fully-paid for their overtime work for which for Defendants which Defendants should have paid within the last five years.

99.     Stated another way, Plaintiff seeks to bring this action as a collective action under the KWHA against Defendant Alliance Coal, LLC[14] on behalf of the following persons:

> all current and former employees of any Alliance Coal, LLC subsidiary[15] who were not fully-paid since November 2, 2014 for all overtime compensation due for such employee's work in Kentucky in one or more workweeks because Defendant did not pay the employee (1) for time worked (or for reporting to work as requested by Defendants to be available to work) prior to scheduled shifts, or (2) overtime compensation due on account of bonus compensation, or (3) the full overtime rate of pay.

100.    Plaintiff is a member of the class he seeks to represent.

101.    Defendants failed to pay Plaintiff and the members of the class he seeks to represent wages for work performed, as described herein, in violation of Kentucky law, including the Kentucky Wages and Hours Act.

102.    Under Kentucky law, employers are required to compensate employees for all of the time that those employees spend working, and for all overtime compensation earned by such employees.

103.    Accordingly, Defendants' refusal to pay Plaintiff and the similarly-situated employees for all of the hours that Plaintiff actually worked and Defendants' refusal to pay the full overtime compensation earned by Plaintiff and the similarly-situated employees violated Kentucky law.

104.    The Rule 23 class is sufficiently numerous that joinder of all members is impractical, satisfying Federal Rule of Civil Procedure 23(a)(1). On information and belief,

---

[14]     The Claims against Defendant Webster County Coal are brought on behalf of Plaintiff and the sub-group of the group described in the text who worked for Defendant Webster County Coal, LLC.

[15]     The term "Alliance Coal, LLC Subsidiary" includes each of the following:  (1) River View Coal, LLC, (2) Warrior Coal, LLC, (3) Sebree Mining, LLC, (4) Hopkins County Coal, LLC, (5) Excel Mining, LLC, (6) Hamilton County Coal, LLC, (7) Gibson County Coal, LLC, (8) Mt. Vernon Transfer Terminal, LLC, (9) Tunnel Ridge, LLC, and (10) Mettiki Coal (WV), LLC.

Defendant has employed more than one thousand of individuals in Kentucky who were subject to Defendant's illegal policies described above.

105.    All members of the Rule 23 Class share the same pivotal questions of law and fact, thereby satisfying Federal Rule of Civil Procedure 23(a)(2).  Namely, all members of the Rule 23 class share the questions of (1) whether Defendants paid them for all time worked; and (2) whether Defendants' failed to pay them the full amount of overtime compensation earned.

106.    The claims of Plaintiff are typical of the claims of the Rule 23 Class, thus satisfying Federal Rule of Civil Procedure 23(a)(3).  Defendants' failure to pay Plaintiff for all hours worked was not the result of any Plaintiff-specific circumstances.  Rather, it arose from Defendants' common pay policies, which Defendants applied generally to their employees.

107.    Plaintiff will fairly and adequately represent and protect the interests of the Rule 23 Class.

108.    Further, Plaintiff has retained competent counsel experienced in representing classes of employees against their employers related to their employers' failure to pay them properly under the law, thus satisfying Federal Rule of Civil Procedure 23(a)(4).

109.    By failing to pay Plaintiff and similarly-situated employees for all hours, and failing to pay employees the full amount of overtime compensation earned, Defendants have created the circumstance under which questions of law and fact common to the Rule 23 Class Members predominate over any questions affecting only individual members. Thus, a class action is superior to other available methods for fair and efficient adjudication of this matter. Accordingly, Plaintiff should be permitted to pursue the claims herein as a class action, pursuant to Federal Rule of Civil Procedure 23(b)(3).

## COUNT I – VIOLATION OF FLSA – NONPAYMENT OF OVERTIME – PLAINTIFF AND THOSE SIMILARLY-SITUATED

110. Plaintiff incorporates by reference all preceding paragraphs as if the same were set forth again fully at this point.

111. Defendant has willfully violated the FLSA by engaging in a pattern or practice (or patterns or practices) of:

        a. failing to keep accurate records showing all the time it permitted and/or required Plaintiff and members of the proposed collective action to work, from the first compensable act to the last compensable act, which has resulted in the denial of compensation at an overtime rate as required by the FLSA, for all time worked in excess of forty hours in a work week; and

        b. permitting and/or requiring Plaintiff and members of the proposed collective action to perform integral and indispensable activities (work) in excess of forty hours in a work week, for the benefit of Defendant and without compensation at the applicable federal overtime rates.

        c. Failing to pay employees the full amount of overtime compensation earned.

112. As a result of Defendant's violations of the FLSA, Plaintiff and those similarly-situated to him suffered damages, including their lost overtime pay, for which they should be awarded compensatory damages, liquidated damages, and attorney's fees and other reasonable litigation expenses.

## COUNT II – VIOLATION OF KY. REV. STAT. ANN. §§ 337.275, ET SEQ BY NONPAYMENT OF WAGES.

113. All previous paragraphs are incorporated as though fully set forth herein.

114. Plaintiff brings this claim on behalf of all members of the proposed Rule 23 Class.

115.    Kentucky state law requires that covered employees be compensated for every hour worked in a workweek. See KY. REV. STAT. ANN. §§ 337.275, *et seq.*.

116.    KY. REV. STAT. ANN. § 337.285 requires that employees receive overtime compensation "not less than one and one-half (1-1/2) times" the employee's regular rate of pay for all hours worked over forty in one workweek.

117.    During all times material to this complaint, Defendant was a covered employer required to comply with the Kentucky Wage Statutes.

118.    During all times material to this complaint Plaintiff and the Rule 23 Class were covered employees entitled to the protections of the KWHA.

119.    Plaintiff, and the Rule 23 Class he seeks to represent are not exempt from receiving the KWHA's overtime benefits because they do not fall within any of the exemptions set forth therein. See KY. REV. STAT. ANN. § 337.285(2).

120.    Defendant has violated the KWHA with respect to Plaintiff and the Rule 23 Class by, inter alia, failing to compensate them for all hours worked at their normal hourly rate (for time worked under forty hours per week) and at one and one-half their "regular rate" for all hours worked in a workweek in excess of forty hours.

121.    In violating the KWHA, Defendant acted willfully and with reckless disregard of clearly applicable provisions of the KWHA.

122.    Pursuant to the KWHA, including KY. REV. STAT. ANN. § 337.385, Defendants, because they failed to pay employees the required amount of wages and overtime at the statutory rate, must reimburse the employees not only for the unpaid wages, but also for liquidated damages in an amount equal to the amount of unpaid wages.

123.     Pursuant to the KWHA, including KY. REV. STAT. ANN. § 337.385, Plaintiff and the Rule 23 Class are entitled to reimbursement of the litigation costs and attorney's fees expended if they are successful in prosecuting an action for unpaid wages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays that the Court:

A.     Issue process and bring Defendants before the Court;

B.     Authorize notice to issue to members of the proposed collective action and permitting similarly-situated persons a reasonable opportunity to join this litigation with respect to claims under the FLSA;

C.     Certify a class of similarly-situated employees whose rights were violated by Defendants under Kentucky law, and grant relief available under Kentucky law, including unpaid wages, liquidated damages, and attorney's fees and other litigation expenses, to the class;

D.     Empanel a jury for the trial of all issues of fact;

E.     Enter a judgment awarding Plaintiff and similarly-situated persons joining this litigation damages from Defendant, including compensation for unpaid work time, compensation for unpaid overtime pay, interest, and liquidated or exemplary damages, in amounts to be proven at trial;

F.     Award Plaintiff and similarly-situated persons joining this litigation all costs of litigation, including expert fees and attorneys' fees;

G.     Grant Plaintiff and similarly-situated persons joining this litigation all costs of litigation and such other further and/or general relief, legal and/or equitable relief, to which they are entitled or which the Court otherwise deems appropriate.

Respectfully submitted,

/s/ Mark N. Foster
Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-1303
Mfoster@MarkNFoster.com
*Counsel for Plaintiff*