**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION**

RANDY BRANSON,                              )
DANIEL CUNNINGHAM, and           )
ALTON JOSEPH NEWBERRY        )
on Behalf of Themselves and All       )
Others Similarly-Situated,                  )         **PROPOSED COLLECTIVE ACTION**
                                                          )         **UNDER FLSA AND CLASS ACTION**
          *Plaintiffs,*                               )         **UNDER KWHA**
                                                          )
                                                          )          CASE NO.     4:19-CV-155-JHM
v.                                                        )
                                                          )
ALLIANCE COAL, LLC,                     )         **JURY DEMANDED**
ALLIANCE RESOURCE PARTNERS,   )
L.P., ALLIANCE RESOURCES          )
OPERATING PARTNERS, L.P.,          )
WEBSTER COUNTY COAL, LLC,      )
WARRIOR COAL, LLC, and             )
RIVER VIEW COAL, LLC,               )
                                                          )
          *Defendants.*                            )
_____)

**AMENDED COMPLAINT**

For their Amended Complaint (filed under Federal Rule of Civil Procedure 15(a)(1)(B) as

a matter of course), Plaintiffs Randy Branson, Daniel Cunningham, and Alton Joseph Newberry,

by and through counsel, on behalf of themselves and all others similarly-situated, as both a

collective action pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. ("FLSA") and

a class action under the Kentucky Wages and Hours Act ("KWHA"), state as follows against

Defendants Alliance Coal, LLC, Alliance Resource Operating Partners, L.P., Alliance Resource

Partners, L.P., Webster County Coal, LLC, Warrior Coal, LLC, and River View Coal, LLC.

## Summary of the Action

1.      Defendants Alliance Coal, LLC ("Alliance"), Alliance Resource Operating Partners, L.P, ("AROP") and Alliance Resource Partners, L.P. ("ARLP") (ARLP, AROP and Alliance are together the "Parent Defendants") are the parent entities that own essentially all of, and control, their subsidiaries[1] Defendants Webster County Coal, LLC, Warrior Coal, LLC, River View Coal, LLC (Defendants Webster County Coal, LLC, Warrior Coal, LLC, and River View Coal, LLC are together the "Subsidiary Defendants").  Each of the Subsidiary Defendants[2] has operated in the last five years employed miners to work in an underground coal mine in the Commonwealth of Kentucky.[3]

2.      Defendants systematically and willfully failed to comply with the requirements of the FLSA and KWHA in at least four ways.

---

[1]      Upon information and belief, Defendant ARLP owns 98.9899% of the interest in Defendant AROP, which in turns owns 99.999% of the interest in Defendant Alliance, which in turn owns 100% of the interest in Defendants Webster County Coal, LLLC,  Warrior Coal, LLC and River View Coal, LLC.

[2]      Defendant Webster County Coal, LLC operated the Dotiki coal mine in Webster County, Kentucky until it was closed in 2019.  Defendant Warrior Coal, LLC has operated and operates the Warrior/Cardinal mine in Hopkins County, Kentucky.  Defendant River View Coal, LLC has operated and operates the River View mine in Union County, Kentucky.  These mines are hereafter collectively referred to as the "Mines."

[3]      In addition to the Kentucky Mines listed in the immediately preceding paragraph, upon information and belief, within five years of the filing of the initial complaint in this matter, the Parent Defendants caused, in their capacity as joint employers of their subsidiaries, payroll violations similar to those complained of herein to occur with respect to workers employed in Kentucky by direct or indirect subsidiaries of the Parent Defendants other than the Subsidiary Defendants, including MC Mining, LLC (which has operated and operates a mine in Pike County, Kentucky), Sebree Mining, LLC (which operated a mine in Webster County, Kentucky) and Hopkins County Coal, LLC (which operated a mine in Hopkins County, Kentucky).  Upon information and belief, the Parent Defendants were joint employers under the FLSA and KWHA with respect to the violations against the employees of each of these subsidiaries.  Plaintiffs are providing notice of this action to each of these subsidiaries, and intends to amend this complaint to add claims (under the FLSA and/or KWHA, as applicable) against such subsidiaries (and related claims against the Parent Defendants relating to the Parent Defendants' liability as joint employers) when an employee of such a subsidiary joins this action. However, to be clear, Plaintiffs are (A) not asserting in this Amended Complaint any claims against any entity other than the Parent Defendants and the Subsidiary Defendants, (B) do not intend to hereafter seek to amend this Complaint to assert any claims relating to work performed outside the Commonwealth of Kentucky (see footnote 4 below), (c) are not asserting in this Amended Complaint claims against any Defendant relating to the work of workers designated as employees of the subsidiaries referenced in this footnote (i.e. subsidiaries other than the Subsidiary Defendants employing workers in Kentucky), and (D) are instead only asserting claims in this Amended Complaint relating to work performed by workers designated as nominal employees of one or more of the Subsidiary Defendants (i.e., workers at the Mines).

3.      First, Defendants required Plaintiffs and similarly-situated workers to report to work before their scheduled shift, but only paid the workers for time worked after the scheduled beginning of the shift.  Defendants illegally failed to pay for "off-the-clock" work performed prior to the scheduled beginning of the shift.  An example of this policy, reduced to writing for the employees of Warrior Coal, LLC, is attached as Exhibit 1 (stating **"[y]ou must be dressed and ready 15 minutes prior to your shift."**) (emphasis in original).

4.      Second, Defendants systematically and willfully failed to pay Plaintiffs and similarly-situated employees the correct overtime rate of pay: instead of including an hourly amount on account of promised bonus compensation with each employee's hourly rate of pay as required by law before multiplying by 1.5 to arrive at the employee's overtime rate of pay, Defendants illegally pretended as if the employees did not receive that bonus compensation in calculating the overtime rate of pay.

5.      Third, Defendants paid substantial weekly productions.  These bonuses were based on non-discretionary formulas.  Therefore, Defendants were required to pay overtime bonus rates (1.5 times the bonus accrued for non-overtime hours) for employees' overtime hours of work. Indeed, to Plaintiffs' current understanding, the formula included the equivalent of an overtime premium by paying each employee 1.5 times as much bonus compensation for the overtime hours Defendants credited the employees with having worked as Defendants paid in bonus compensation for non-overtime hours worked.  However, because Defendants illegally did not credit employees with their "off the clock" pre-shift work, Defendants' formula used an artificially low number of overtime hours, and therefore failed to fully compensate employees for their overtime work in calculating the amount of employees' production bonus compensation.

6.      Finally, Defendants sometimes paid overtime rates of pay of less than 1.5 times employees' "base" hourly rate (even assuming that not accounting for nondiscretionary bonuses was proper, which it was not), shaving a few dollars off the pay of employees here and there.

7.      These illegal practices by Defendants were systematically applied by Defendants to workers at each of the Mines, in violation of the FLSA and Kentucky[4] law, including the KWHA.  Defendants should pay the wages illegally withheld from their employees.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the claims of Plaintiffs and those similarly-situated pursuant to 28 U.S.C. §§ 1331 and 1337 and 29 U.S.C. § 216(b).

9.      This Court has and should exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims under the KWHA because they are so related to Plaintiffs' claims under the FLSA that they form part of the same case or controversy and arise from the same set of operative facts as Plaintiffs' claims under the FLSA.

---

[4]      In the initial Complaint (Ct. Doc. 1), Plaintiff Randy Branson alleged that workers who worked at mine subsidiaries of Defendant Alliance were similarly-situated to Plaintiff Randy Branson with respect to Plaintiff Randy Branson's claim against Alliance Coal.  See Complaint at footnote 1.  This included workers at mines outside Kentucky.  While Plaintiffs continue to contend that the workers who worked at the Mines are similarly-situated to Plaintiffs, and also contend that workers who worked in Kentucky for other subsidiaries of the Parent Defendants may also appropriately be added as defendants in a later amendment to this Complaint upon a worker of such subsidiary joining this action (see footnote 3 above), Plaintiffs no longer intend to seek to make allegations either in this Amended Complaint or in any future amendment to their Complaint to seek relief against Defendants relating to work performed by workers of Parent Defendants' subsidiaries and facilities located outside the state of Kentucky, including the Hamilton County Coal mine in Hamilton County, Illinois operated by Hamilton County Coal, LLC, the Gibson South and the Gibson North mines in Gibson County, Indiana operated by Gibson County Coal, LLC, the Mount Vernon Transfer Terminal at Mount Vernon, Indiana operated by Mount Vernon Transfer Terminal, LLC, the Tunnel Ridge Mine located near Wheeling, West Virginia operated by Tunnel Ridge, LLC, or the Mountain View Mine located in Tucker County, West Virginia operated by Mettiki Coal (WV), LLC.  To be clear, Plaintiffs may in the future assert that evidence relating to the interactions of Defendants with those out-of-Kentucky subsidiaries, including the Parent Defendants' joint-employer control of those out-of-Kentucky subsidiaries, constitutes relevant evidence supporting Plaintiffs' claims that the Parent Defendants similarly controlled the Subsidiary Defendants and were joint employers of the Subsidiary Defendants, but the Plaintiffs do not intend to seek to have workers of the out-of-Kentucky facilities included in the proposed collective action under the Fair Labor Standards Act or as part of the proposed Rule 23 class under the Kentucky Wages and Hours Act in this case, or to otherwise seek relief  in this action relating to violations at the out-of-Kentucky facilities.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants conduct business within the District and employed Plaintiffs and the other employees who worked at the Mines within the District of this Court and, specifically, in Webster County, Kentucky, Hopkins County, Kentucky, and Union County, Kentucky.

**PARTIES**

11.     Plaintiff Randy Branson is a resident of Webster County, Kentucky.

12.     Plaintiff Daniel Cunningham is a resident of Hopkins County, Kentucky.

13.     Plaintiff Alton Joseph Newberry is a resident of Webster County, Kentucky.

14.     Defendant Alliance Coal, LLC is a for-profit limited liability company organized under the laws of the state of Delaware, with its stated-by-Defendant principal place of business being  located at 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886; upon information and belief Defendant Alliance Coal, LLC may be served by service of process on its registered agent for service of process in the Commonwealth of Kentucky at Cogency Global, Inc. 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

15.     Defendant Alliance Resource Partners, L.P. is a for-profit limited partnership organized under the laws of the state of Delaware, with its stated-by-Defendant principal place of business being  located at 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886; upon information and belief Defendant Alliance Coal, LLC may be served by service of process on its registered agent for service of process in the Commonwealth of Kentucky at Cogency Global, Inc. 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

16.     Defendant Alliance Resource Operating Partners, L.P. is, upon information and belief, a full profit limited partnership organized under the laws of the state of Delaware, with its stated-by-Defendant principal place of business being 1717 S. Boulder Avenue, Tulsa, Oklahoma

74119-4886; upon information and belief Defendant Alliance Resource Operating Partners, L.P. may be served by service of process on its registered agent, which, upon information and belief, is Cogency Global, Inc., 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

17.     Defendant Webster County Coal, LLC is a for-profit limited liability company organized under the laws of the state of Delaware, with its stated-by-Defendant principal place of business being 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886; upon information and belief Defendant Webster County, LLC may be served by service of process on its registered agent for service of process in the Commonwealth of Kentucky which is Cogency Global, Inc., at 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

18.     Defendant Warrior Coal, LLC is a for-profit limited liability company organized under the laws of the state of Delaware, with its stated-by-Defendant principal place of business being 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886; upon information and belief Defendant Webster County, LLC may be served by service of process on its registered agent for service of process in the Commonwealth of Kentucky which is Cogency Global, Inc., at 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

19.     Defendant River View Coal, LLC is a for-profit limited liability company organized under the laws of the state of Delaware, with its stated-by-Defendant principal place of business being 1717 S. Boulder Avenue, Tulsa, Oklahoma 74119-4886; upon information and belief Defendant Webster County, LLC may be served by service of process on its registered agent for service of process in the Commonwealth of Kentucky which is Cogency Global, Inc., at 828 Lane Allen Road, Suite 219, Lexington, Kentucky 40504.

20.     Each Plaintiff was nominally employed by one or more of the Subsidiary Defendants.  Specifically, within the last three years working primarily[5] at the Dotiki mine, (A) Plaintiff Randy Branson was nominally employed by Defendant Webster County Coal, LLC working at the Dotiki mine, (B) Plaintiff Alton Joseph Newberry was nominally employed by Defendant Webster County Coal, LLC working at the Dotiki mine, and then, later, by Defendant River View Coal, LLC working at the River View  mine, and (C) Plaintiff Daniel Cunningham was nominally employed by Defendant Webster County Coal, LLC working at the Dotiki mine, and then, later, by Defendant Warrior County Coal, LLC at the Warrior/Cardinal mine.

21.     Along with being employed by the Subsidiary Defendants which was or were the nominal employer(s) of each Plaintiff, each Plaintiff was also jointly employed by each Parent Defendant, including as described in more detail below.

22.     Upon information and belief, each Subsidiary Defendant is a wholly-owned subsidiary of Alliance Coal, LLC (which is in turn a subsidiary of the other Parent Defendants) and employs its employees in accordance with policies that are uniformly established and directed by the Parent Defendants, including as described in more detail below.

23.     Upon information and belief, each Parent Defendant exerted and exerts supervisory control over all employees (including Plaintiffs) of each subsidiary Defendants, and was and is involved in the daily operations of the business of the Subsidiary Defendants as it pertains to the employment of all such employees, including as described in more detail below.

---

[5]     Plaintiff Randy Branson's nominal employer was at all times Webster County Coal, LLC.  However, he at times performed work at the River View mine operated by River View Coal, LLC.  That employee would be paid by one nominal employer for work that did not benefit that nominal employer but instead benefited only a sister subsidiary (a separate wholly owned subsidiary of the nominal employers' parent company further demonstrates that the Parent Defendants controlled the work of the employees of the Subsidiary Defendants and were joint employers with respect to that work.  Upon information and belief, no accounting was performed between entities for work performed at the facility of one entity by the nominal employees of another entity, so long as all of the entities were wholly owned subsidiaries of Alliance.

24.     In the five years preceding the filing of the initial Complaint in this action (and also in the last three years preceding this Amended Complaint), Defendants have employed in the Mines in non-exempt[6] positions Plaintiffs and many other similarly-situated current and former employees.

25.     Each Defendants' annual sales have at all times relevant to this Complaint exceeded $500,000.00.  Indeed, Defendants have boasted that they have vastly higher sales.  Specifically, ARLP has asserted that in 2018 it alone sold 2.5 million tons of coal from the Dotiki Mine, 9.8 million tons of coal from the River View Mine, and 3.5 million tons of coal from the Warrior Mine.  See Illinois Basin page from Defendants' website attached to the initial Complaint in this matter as Exhibit 1 (Ct. Doc. 1-2).  At an average rate of $43.75 per ton[7], the 2.5 million tons of coal produced by the Dotiki mine was valued at $109,375,000.00 and the 15.8 million tons of coal produced by the employees of the Mines was valued at $691,250,000.00.

26.     Each Defendant is an enterprise engaged in commerce or in the goods for commerce, or in the production of goods for commerce, as defined in 29 U.S.C. § 203.

## FACTUAL ALLEGATIONS

### Defendants Require "Off-The-Clock" Work Prior To Scheduled Shifts

27.     Each Plaintiff was regularly scheduled to work shifts at the coal mine of the Subsidiary Defendant who was each Plaintiff's nominal employer.

---

[6]     As used herein, "non-exempt" means that the employees in question worked in positions that were not exempt from the protections of the Fair Labor Standards Act and the Kentucky Wages and Hours Act, and that therefore, entitled the workers working in those positions to be paid overtime compensation in accordance with those acts for work performed in excess of forty hours per week.

[7]     This is the rate per ton of coal which is published by the United States Energy Information Administration. See Average Sales Price of Coal by State and Coal Rank, 2018, attached to the initial Complaint in this matter as Exhibit 4 (Ct. Doc. 1-5) (also available online at https://www.eia.gov/coal/annual/pdf/table31.pdf) (last checked October 30, 2019).

28.     Defendants directed Plaintiffs to arrive at workplaces early enough to "dress out" and be "dressed and ready" fifteen minutes prior to the beginning of their scheduled shifts.

29.     However, Defendants never paid Plaintiffs for the time between when they were required to arrive (prior to their scheduled shift so that they could "dress out" and be "dressed and ready" fifteen minutes before his scheduled shift) and the scheduled beginning of his shift.

30.     Instead, Defendants only began paying Plaintiffs for their work at the scheduled beginning of their shifts.

31.     Because Defendants required Plaintiffs to be present at their facility for Defendants' convenience to be ready to work at Defendants' request, Plaintiffs were, at the very least, "engaged to wait" during those fifteen minutes and therefore should have been compensated for those fifteen minutes as compensable work, even if Plaintiffs did absolutely nothing during that time.

32.     However, during the time that Plaintiffs were required to be present at the Dotiki Mine prior to the scheduled beginning of his shift, Plaintiffs performed a variety of activities that constituted compensable work, including the following:

(a)     "Donning" specialized protective equipment required for the dangerous environment of an underground coal mine, including boots, helmet, gloves, and clothing issued by the Defendants.[8]

(b)     Gathering tools to be used during Plaintiffs' scheduled shift; and

(c)     Gathering materials to be used during Plaintiffs' scheduled shift.

---

[8]     Because Defendants' policy was that employees were required to be "dressed out" fifteen minutes before their scheduled shifts, this "donning" work, which itself required minutes and was necessarily performed at Defendants' facility because employees were prohibited from taking their clothing and equipment home, was in addition to the fifteen minutes of other work prior to the scheduled beginning of a shift.

33.     The Dotiki mine operated by Defendant Webster County Coal, LLC closed during the year 2019.

34.     Employees that were employed at the Dotiki mine were offered by the Parent Defendants the opportunity to transfer to become nominal employees of either River View Coal, LLC or Warrior Coal, LLC.[9]

35.     Workers who transferred from the Dotiki mine to become employees of Warrior Coal, LLC were given an orientation; at the orientation, workers were given a packet of documents. Within this packet was a document entitled "Warrior Coal, LLC Call In Procedures."   The document stated in bold print: "[y]ou must be dressed and ready 15 minutes prior to your shift."

36.     An authentic copy of this document, prepared and circulated to employees of Warrior Coal, LLC in September, 2019, is attached hereto as Exhibit 1.[10]

37.     Defendant Webster County Coal, LLC previously had signs posted at the Dotiki Mine specifically stating that employees were required to be at the mine fifteen minutes before their scheduled shift.

38.     Upon information and belief, within the last three years, or, in the alternative, within the last five years, Defendant removed these signs because Defendant was concerned that these

---

[9]     The fact that the Parent Defendants treated the employees of Webster County Coal, LLC as fungible and interchangeable with its miners at Warrior Coal, LLC and River View Coal, LLC in connection with the closing of the Dotiki mine and the transfer of such workers to become nominal employees of River View Coal, LLC and Warrior Coal, LLC is further evidence that Parent Defendants controlled each of the Subsidiary Defendants and acted as a joint employer with each of the Subsidiary Defendants.

[10]    While Plaintiffs have not yet obtained documents in which Defendants expressly documented in writing their illegal policy with respect to workers at the River View Mine and at the Dotiki Mine, Plaintiffs believe that such documents exist.  In any event, the same illegal policy of requiring employees to come in and be dressed and ready fifteen minutes prior to the time in which the employees began being paid was in effect at all of the Subsidiary Defendants' mines, a common policy itself illustrating the from-the-top orchestration of this policy by the Parent Defendants.

signs could be used in an action such as this one[11] to establish that Defendant did in fact have a policy of requiring employees to be present fifteen minutes before the schedule beginning of their shift, but did not pay employees for this compensable time.

39.     At all times, including both before and after the removal of the signs as noted above, Defendants were aware that they were required to pay employees for the time spent dressing out, for fifteen minutes prior to the scheduled beginning of the shift, and indeed, from the first moment each employee began performing work.

40.     At all times, including both before and after the removal of the signs as noted above, Defendants were aware that employees were in fact reporting to work so as to be "dressed out" fifteen minutes prior to the scheduled beginning of the shift and were performing work prior to the scheduled beginning of their shifts, including "dressing out" and performing work during the fifteen minutes preceding the beginning of their shifts.

41.     Defendants have numerous cameras in the above-ground section of each of the Mines that capture and store video images of employees arriving at each mine prior to the scheduled beginning of their shift and performing work (or, at the very least, being present and prepared to perform work at Defendants' request) prior to the scheduled beginning of their shift.

42.     Upon information and belief, the video footage is of sufficient quality to allow the viewer to recognize individual employees and determine when each individual employee arrived and began performing work for Defendant Alliance Coal, LLC and its applicable subsidiary.

---

[11]     Although Defendants knew when they removed the signs (at the very latest) that the policy of requiring employees to report early violated the FLSA because employees were not being paid overtime pay for that time, Defendants did not cause overtime to be paid or correct their policy at the time the signs were removed; Defendants simply chose to continue to violate the FLSA, demonstrating the willfulness of their violations.

43.     Defendants should maintain all video footage that Defendants have of workers at the Mines prior to the scheduled beginning of their shifts so that the jury may determine whether the allegations in this Complaint are supported by that video footage.

44.     In addition to being actually aware, through its management, that workers were arriving early and working without pay as expressly directed, each Subsidiary Defendant had sophisticated technology installed by a separate subsidiary of the Parent Defendants (Matrix Design Group, LLC) which further provided detailed and specific information to the Defendants about the times that employees were reporting to work prior to the scheduled beginning of their shift and performing work prior to the scheduled beginning of their shift.

45.     Specifically, "tracker" devices that are capable of tracking the exact location of each miner to a very high degree of certainty are attached to each miner's helmet, which is kept by the miner at the workplace at all times.

46.     The tracking system does not merely record the current location of each miner's tracker device, but also records and preserves in Defendants' data systems the exact time each miner moved to a new location.

47.     Prior to the beginning of every shift, the tracker device and the tracking system installed at each Subsidiary Defendant's mine automatically recorded the fact of the helmet beginning to move when the tracker device would register with a different receiver besides the one installed in the "bathhouse" area of each mine's facility.

48.     Therefore, while the tracker device would not necessarily capture the exact time an employee began to perform work if the employee performed work before gathering his or her helmet or performed donning work, including donning the helmet, before moving the helmet sufficiently to trigger the tracker device to register a change in location, Defendants knew from

the tracker data that, at the very latest, each worker should have been paid from the time that the tracker device first showed on a particular day the worker having moved within Defendants' mine facility, including moving out of the bathhouse and being picked up by a different receiver in a different location of Defendants' mine facility.

49.     Further, Defendants actually instructed workers at the mines to wave their helmet and tracker device under a timeclock-like device for the purpose of registering the fact that they were present.

50.     Although Defendants' system automatically recorded the exact time when each Plaintiff would wave his tracking device under such time clock-like device, Defendants did not utilize that time for the purpose of paying Plaintiffs.

51.     Indeed, Defendant never paid any of the employees for their time expended in compensable activities prior to the scheduled beginning of the shift; instead, Defendants paid Plaintiffs and those similarly-situated only when the scheduled beginning of the shift began.

**Defendants Do Not Take Into Account Bonus Compensation As Required By Law In Calculating Employees' Overtime Rates of Pay**

52.     In addition to not paying employees for time which should have been compensated prior to the scheduled beginning of employees' shifts (as discussed above), Defendants also did not pay Plaintiffs and those similarly-situated the appropriate overtime rate of compensation for employees' overtime work.

53.     Federal law requires that bonus compensation promised to an employee for working for a particular period of time must be included in determining the "regular rate" of compensation for an employee, which is in turn the basis for determining the appropriate rate of overtime compensation for overtime work.

54.     Specifically, 29 U.S.C. § 207(a) prohibits employment of non-exempt employees beyond forty hours in a work week "unless such an employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

55.     29 U.S.C. § 207(e) in turn defines the term "regular rate" by stating that "the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee."

56.     29 U.S.C. § 207(e)(3) provides an exception for discretionary bonuses to the rule that all remuneration should be included in the regular rate.

57.     However, none of the bonuses paid by Defendants qualify as discretionary bonuses under that subsection because that subsection requires that for such bonuses, the bonus is only eligible for exclusion from the regular rate if "both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement or promise causing the employee to expect such payments regularly."

58.     Indeed, 29 C.F.R. § 778.211(c) specifically provides that "*Promised bonuses not excluded.* The bonus, to be excluded under section 7(e)(3)(a), must not be paid 'pursuant to any prior contract, agreement, or promise.'  For example, any bonus which is promised to employees upon hiring or which is the result of collective bargaining would not be excluded from the regular rate under this provision of the Act."

59.     Plaintiffs and those similarly-situated were paid several forms of bonus compensation which were not discretionary and which should have been included in such

employees' "regular rate" of compensation in determining such employees' overtime rate of compensation.

60.     Specifically, Defendants provided Plaintiffs with a "Benefits Handbook" which described certain bonus compensation to which Plaintiffs would be entitled as part of Plaintiffs' compensation for their work for Defendants.

61.     A copy of a "Benefits Handbook" similar to that provided to Plaintiffs, and which was provided by Defendants to another employee of the Dotiki mine, is attached to the initial Complaint in this matter as Exhibit 5 (Ct. Doc. 1-6).

62.     The Benefits Handbook described certain bonuses which Plaintiffs and the similarly-situated employees were promised and thus caused to expect regularly, including the following bonus payments as described by the Benefits Handbook as follows:

**Attendance Incentive Bonus**

An employee achieving attendance benchmarks for working without the incurrence of absences (other than paid vacation, paid personal, paid bereavement leave, safety day, or jury duty or court-ordered appearance) will receive a bonus of fifty dollars ($50.00), which will increase annually but fifty dollars ($50.00) for each subsequent and consecutive year in which subsequent attendance benchmarks are reached, with no maximum limit. The time period for calculating whether an employee qualifies for an attendance incentive bonus shall begin each year on December 1st and end on November 30th of the following year.

The attendance incentive bonus is generally paid during the month of December.

Any break in service to the Company or incurrence of non-paid absence from regularly scheduled work shall result in an employee's attendance incentive bonus being reset to zero dollars ($0.00). However, temporary shutdowns of your location due to mining conditions or equipment issues beyond employee control shall not be considered a break in service for the purpose of calculating consecutive years of eligibility.

The Company reserves the right to change the qualifications for the Attendance Incentive Bonus at any time, as well as determine the eligibility and qualifying achievement of those who may receive the Attendance Incentive Bonus.

…

**New Electrical Certification Bonus**

For obtaining a State or Federal Electrical Certification, an employee may be eligible for a one-time (for each locally applicable jurisdiction) bonus of five hundred dollars ($500.00), along with reimbursement of limited out-of-pocket expenses approved by the Company. To qualify for this bonus, an employee must not have been paid for time necessary to obtain the certification. Additionally, you must be employed by your (or a participating) employer on the day the bonus is distributed. The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the New Electrical Certification Bonus.

**New Mine Foreman Certification Bonus**

For obtaining a new Mine Foreman Certification, you may be eligible for a New Mine Foreman Certification Bonus of five hundred dollars ($500.00), as well as a reimbursement of limited out-of-pocket expenses. The New Mine Foreman Certification Bonus is offered as a one-time bonus for each state in which an employee obtains Mine Foreman Certification for the first time. Additionally, to be eligible an employee must not have been paid for the time necessary to obtain the certification. Additionally, you must be employed by your (or a participating) employer on the day the bonus is distributed. The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the new Mine Foreman Certification Bonus.

**Emergency Medical Technician (EMT) Certification Bonus**

For obtaining an Emergency Medical Technician (EMT) certification, an employee is eligible to receive an Emergency Medical Technician Bonus of one thousand dollars ($1,000.00), as well as reimbursement of limited out-of-pocket expenses. Additionally, employees certified as an Emergency Medical Technician are eligible to receive one thousand dollar ($1,000.00) bonus annually for so long as the certification remains current and the employee remains an employee of the Company on the day the bonus is distributed. The amount of an Emergency Medical Technician Bonus may be prorated, for a calendar year, if the individual receiving the bonus is certified for less than the full calendar year for which the bonus is being paid. The Emergency Medical Technician Bonus generally will be paid in December.

The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the Emergency Medical Technician Certification Bonus.

**Mine Emergency Technician (MET) Certification Bonus**

For obtaining a Mine Emergency Technician (MET) certification, an employee is eligible to receive a Mine Emergency Technician Bonus of three hundred fifty ($350.00), as well as reimbursement of limited out-of-pocket expenses. Additionally, employees certified as a MET are eligible to receive a three hundred fifty dollar ($350.00) bonus annually for so long as the certification remains current and the employee remains an employee of the Company on the day the bonus is distributed.  The amount of a Mine Emergency Technician Bonus may be prorated, for a calendar year, if the individual receiving the bonus is certified for less than the full calendar year for which the bonus is being paid.  The Mine Emergency Technician Bonus generally will be paid in December.

The Company reserves the right to make a final determination as to an employee's eligibility or qualification for receipt of the Mine Emergency Technician Certification Bonus.

An employee who receives an EMT bonus is not eligible for an MET bonus.

See Initial Complaint Exhibit 5 at 154 (PDF Page 153)[12] and 155-156 (PDF Pages 154-155).

63.     Upon information and belief handbooks describing essentially-identical bonuses paid to nominal employees of River View Coal, LLC and Warrior Coal, LLC were distributed to such employees.[13]

64.     Defendants paid these bonuses to Plaintiffs[14] and other similarly-situated employees, but did not include them in the "regular rate" used to calculate the overtime rate of pay for Plaintiffs and the similarly-situated employees.

---

[12]     Page 69 of the Benefits Handbook, which information and belief contained the remainder of "Appendix C; Services and Products that Require Preauthorization" that begins on page 68 (and is irrelevant to the bonuses complained of herein).

[13]     Upon information and belief, such handbooks also had essentially identical language as that quoted below.

[14]     Plaintiff Randy Branson received the Attendance Incentive Bonus and the Mine Emergency Technician (MET) Certification Bonus.  See, *e.g.*, attached to the initial Complaint as Exhibit 6 at 80 in this matter (Ct. Doc. 1-7) (Defendant's December 28, 2107 paystub).   Although Plaintiff Randy Branson did not receive the EMT, Mine Foreman, or Electrical Certification bonuses, they are of an almost identical type to the MET Bonus which Plaintiff Randy Branson did receive because they all similarly compensate employees for certifications and education which benefits Defendants through the employee's work (and, indeed, paystub entries reflecting payment of Plaintiff Randy Branson's MET bonus shows this payment under the entry "EMT/MET Bonus," *see id.*).   Accordingly, Plaintiffs

65.     In addition to the bonuses described above, the Benefits Handbook provided that "each full time employee will receive a bonus equivalent to forty (40) hours of regular pay, which is generally paid in December prior to Christmas.  Each full time hourly employee will receive forty (40) hours multiplied by the employees' regular base rate of pay…for employees less than one year of service, the bonus will be prorated.  In order to receive the five days paid bonus, an employee must still be employed by the company the date the bonus is distributed."  Initial Complaint, Exhibit 5 at 154-155 (PDF Pages 153-154)

66.     Further, the Benefits Handbook promised Plaintiffs and each other similarly-situated employee that "the seniority days bonus is paid to full time employees every December, starting their sixth year of service.  The amount of the bonus is based on an accrual of seniority days at a rate of one day for each year after five years of service.  For hourly employees the bonuses equal to eight hours multiplied by the employees' regular based rate for each seniority day they have accrued…for all eligible employees the maximum number of seniority days accrual is the greater of one twenty days or two seniority days that you accrued and were paid in 2016.  To be eligible you must be employed with a participating employer on the day the bonus is distributed….to be eligible for seniority days bonus you must be employed with your employer on the day the bonus is distributed." Initial Complaint, Exhibit 5 at 155 (PDG Page 154).

67.     The Seniority Days Bonus and the Five Days Bonus should have been included in calculating employees' overtime rates of pay.

68.     Specifically, in addition to not qualifying for exclusion from the regular rate as discretionary bonuses under 29 U.S.C. § 207(e)(1), the bonuses were not "paid as gifts" or

---

assert that employees who received any of these type of bonuses are similarly-situated to Plaintiffs because all of these types of bonuses should have been included in the regular rate in calculating the overtime rate of pay.

"payments in the nature of gifts made at Christmastime or on other special occasions," and, therefore, were not excludible from the "regular rate" under 26 U.S.C. § 207(e)(1).

69.     Indeed, under Kentucky law, the employees had a legal right to the payment of the portion of such bonuses accrued prior to such time as the employer informed the employees that the employer was prospectively terminating the bonus plan (which Defendants never did).

70.     Specifically, while the Benefits Handbook provided that "the company reserves the right to amend or terminate any benefit plan at any time and for any reason without the consent of any employer or other party" (see Initial Complaint Exhibit 5 at 2) and also provided with respect to the "Special Benefits" that "policies, procedures, and rules are subject to change at any time" and that "management reserves the right to modify any benefit at any time," (see Initial Complaint, Exhibit 5 at 147 (PDF Page 146), the Benefits Handbook was ambiguous as to whether management was reserving the right only to prospectively amend or terminate the benefits described herein, or the right to both prospectively and retroactively (in other words, after the employees had earned rights to benefits) terminate the benefit.

71.     Under these circumstances, and, as Defendants were the drafters of the document containing this ambiguity (and accordingly, the ambiguity would under state law be construed against Defendants), each employee was entitled under Kentucky law to the bonuses described in the benefits guide; in other words, each employee had a legal right to the payment of the benefits described therein and could bring suit to enforce those benefits.  Therefore, the payments were not in the nature of a gift.

72.     Notably, the benefits guide did not anywhere disclaim that a contract was being created thereunder under which employees could expect to be able to accrue benefits as described

in the benefits guide until such time as management informed the employees that it was prospectively terminating those benefits.

73.     Indeed, under the factual circumstances, if Defendants were to have announce in December of any year, after Plaintiffs and similarly-situated employees had worked all year under the understanding that they would receive the Five-Day Pay Bonus and Seniority Days Bonus, that Defendants did not intend to honor or pay those Bonuses because they were "terminating" the bonuses not only for the future year, but for the year already worked, Plaintiffs and the similarly-situated employees would have been legally entitled to sue for and recover the Bonuses already earned;[15] therefore, the bonuses should have been included in calculating overtime rates of pay.

74.     Defendants did not include these bonuses in calculating the overtime rate of pay of Plaintiffs and the similarly-situated employees; Defendants paid the Plaintiffs and the similarly-situated employees, at most, exactly 1.5 times the employees' hourly rate of pay as the overtime rate of compensation.

75.     Had the Defendants appropriately included the bonus compensation in the employees' "regular rate" of pay for purposes of calculating the employees' overtime rate of pay,

---

[15]     *See e.g., Secretary of the United States Department of Labor v. Bristol Excavating, Inc.*, ___ F. 3d. ___ (3rd Cir. August 20, 2019) ("One can imagine a circumstance in which an employer tries to pressure an employee to accept remuneration from a third party so as to artificially suppress on paper what the employer and employee both regard as the regular rate of pay.  Such a manipulation would also occur if an employer tried to categorize a portion of what was a base pay as instead being a bonus.  The parties' true agreement is what should matter, not labels.  *See Youngerman-Reynolds Hardwood* 325 U.S. At 424 ('[The regular rate] is not an arbitrary label chosen by the parties; it is an actual fact.' This is not only a matter of common law, but also of common sense…As for common sense, we cite no less an authority than Clark W. Griswold.  In the classic movie *National Lampoon's Christmas Vacation*, the plot revolves around Clark's anxious anticipation of his Christmas bonus.  *See* National Lampoon's Christmas Vacation (Warner Bros. 1989) (Really, you should see it.).  When the regular bonus does not arrive and instead Clark receives a jelly-of-the-month club membership, he berates his boss, saying, 'Seventeen years with the company, I've gotten a Christmas bonus every year but this one.  You don't want to give bonuses, fine.  But when people count on them as a part of their salary, well[.]' *Id.*  Unlike the Christmas lights on his house, Clark doesn't seem to be overly bright but he at least understands how a course of dealing can lead to an expectation that could be viewed as a meeting of the minds about remuneration for employment.  In other words, it is common sense that labels alone do not control.  And, of course, the required agreement between employer and employee need not be explicit.  It may be implied through an employer's significantly facilitating regular compensation that reaches the employee.")

Plaintiffs and the other similarly-situated employees would have received substantially higher rates of pay.

76.     Defendants should be made to pay the overtime compensation which they should have paid, but did not pay because they used an erroneous, lower-than-legally-required overtime rate of compensation.

**Defendants Failed To Appropriately Calculate The Overtime Premium Due To Employees In Connection With Their Substantial Weekly Production Bonuses**

77.     In addition to the bonuses describe above, Defendants' Benefits Handbook promised that "a weekly production bonus is paid to employees based on productivity and manhours.  See local management for details about the production bonus, including who is eligible and how it is calculated."

78.     The Benefits Handbook did not state in any way that the production bonus was tied or "calculated" in any way based on the Defendants' discretion.

79.     Indeed, a formula was used by each Subsidiary Defendant to calculate the production bonus of employees.

80.     The formula was made known by each Subsidiary Defendant to its nominal employees.

81.     The formula was based upon empirical facts, and, therefore, a third party could, by reviewing the formula and the facts referenced therein, compute the amount of production bonus to which each employee was entitled.

82.     For instance, the formula took into account the amount of coal mined during the week in the mine in question, the percentage of the coal mined which was "clean," the number of employee hours expended to mine the coal, and similar objectively-quantifiable facts.

83.   The bonus was therefore not eligible as a discretionary bonus to be excluded from the "regular" rate under 29 U.S.C. § 207(e)(3), and additional overtime compensation had to be paid relating to the production bonus.

84.   Based on the information Plaintiffs have received to date, it appears that Defendants partially compensated employees for their overtime work by including within the weekly production bonus formula that hours which Defendants credited each employee with having worked in excess of forty hours per week were treated as entitling the employee to 1.5 times the amount of weekly production bonus as hours worked less than forty hours per week.

85.   However, that formula did not entirely compensate employees for the overtime work they performed because employees were not paid for all of their overtime work and the weekly production bonuses were only based on the hours of work for which Defendants credited the employees; Defendants' formula illegally did not take into account the off-the-clock work performed prior to the scheduled beginning of the shift as described in paragraphs 27 through 51 above.

86.   Upon information and belief, the "Safety Incentive Bonus" (see Initial Complaint, Exhibit 5 at 154 (PDF Page 153)) was, like the weekly production bonuses, calculated based on empirical facts, and included an implicit overtime premium, but did not fully compensate Plaintiffs and the similarly-situated employees for all of their overtime work because it did not account for the employees' off-the-clock work.

87.   To illustrate the fact that bonuses were paid to Plaintiffs but not incorporated by Defendants in calculating the overtime rates of payment, attached to the Initial Complaint as Exhibit 6 are pay stubs of Plaintiff Randy Branson from November 1, 2014 until the present.  For example, Plaintiffs' paystub dated December 28, 2017 (Page 80 of Initial Complaint, Exhibit 6)

shows that Plaintiff Randy Branson received in 2017 $350.00 in MET bonus, $976.80 in Five Day

Bonus, $1,172.16 in Seniority  Days Bonus, $250.00 in Attendance Award, $1,24.86 in Safety

Bonus, and $9,979.65 in Weekly Production Bonus; nevertheless the overtime rates of pay were

not increased to account for this bonus compensation.  See Initial Complaint, Exhibit 6.

88.     Paystubs were issued to the Plaintiffs other than Randy Branson and similarly-

situated employees in essentially-identical format showing bonuses paid, but not incorporated into

such employees' overtime rates of pay.

### Defendants Fail To Pay Even One-and-One-Half Times Employees' Hourly Rate Of Pay For Overtime Work In Certain Pay Periods

89.     Bizarrely, in addition to failing to comply with the FLSA and KWHA in the

manners described above, Defendants brazenly violated the most fundamental requirement of

those statutes.

90.     Specifically, on many pay periods, Defendants would show the number of hours

which Defendants credited the employee with having worked, would show the amount earned by

the employee for having worked forty non overtime hours in the week, and would show the amount

being paid for overtime pay.

91.     Amazingly, the rate of overtime pay would often be slightly less than 1.5 half times

the regular hourly rate.

92.     For example, Plaintiff Randy Branson's paystub for the period beginning

December 11, 2017 and ending December 17, 2017 is page 80 of Initial Complaint, Exhibit 6.

93.     During this one-week pay period, the paystub reflects Plaintiff Randy Branson was

credited with having worked 56.00 hours.

94.     The paystub reflected that Plaintiff Randy Branson had earned $988.80 in regular

wages.

95.     Further, the paystub reflects that Plaintiff Randy Branson was paid $589.68 for overtime pay.

96.     Basic math indicates that Defendants underpaid Plaintiff Randy Branson in the amount of $3.60 for this period, even if it is assumed that Plaintiff Randy Branson worked only 56.00 hours during this period[16] and that no bonus or other compensation other than the regular wages should be taken into account in determining the overtime rate of compensation.

97.     Specifically, when one divides the regular hourly wages of $988.80 by 40 hours, Plaintiff Randy Branson is being paid $24.72 on this paystub for Plaintiffs' non-overtime work.

98.     However, while 1.5 times $24.72 per hour is a simple mathematical formula (specifically, it is $37.08 per hour), Defendant did not pay Plaintiff Randy Branson 1.5 times the hourly rate on this paystub.

99.     Specifically, when one divides the $589.68 shown on this paystub as having been paid for overtime pay by the 16.00 hours of overtime work this paystub shows as having been worked during this period, it is apparent that Defendants only paid Plaintiff Randy Branson approximately $36.855 per hour for his overtime work during this period, which amounts to approximately 1.490898 times his hourly rate of pay.

100.    If Defendants had paid Plaintiff Randy Branson 1.5 times his hourly rate for the 16.00 hours of overtime work reflected on this paystub, they would have paid Plaintiff Randy Branson $593.28 ($37.08 times 22.25).

101.    However, with no explanation whatsoever, Defendants paid Plaintiff Randy Branson only $589.68 during this pay period.

---

[16]     In other words, assuming Plaintiff Randy Brandon performed no off-the-clock work.

102.    As a result, Defendants underpaid Plaintiff Randy Branson $3.60 ($589.68-$593.28) even if all of the other violations described above are disregarded.

103.    The violations shown on the paystub for the week of December 11, 2017 through December 17, 2017 (Page 80 of Initial Complaint Exhibit 6) were not isolated violations (see, e.g., paystub for week beginning October 2, 2017, page 64 of Initial Complaint Exhibit 6 ($3.31 underpaid in one-week period); while Defendants did not always do so, Defendants regularly and systematically underpaid Plaintiff Randy Branson by paying Plaintiff amounts slightly less than 1.5 times his hourly rate for overtime hours worked.

104.    Tellingly, upon information and belief, Defendants never upon information and belief paid Plaintiff Randy Branson or others similarly-situated slightly more than 1.5 times his hourly rate for overtime hours worked.

105.    Upon information and belief, the slight underpayment in some work weeks was a systematic and willful violation by Defendants of Defendants' obligation to pay 1.5 times the non-overtime rate of pay for overtime worked performed.

106.    Upon information and belief, Defendants, by underpaying employees in small amounts, saved large amounts of money over the course of time and over the course of taking similar amounts from their thousands of other similarly-situated employees.

**Each Parent Defendant was a Joint Employer with Each Subsidiary Defendant.**

107.    Upon information and belief, the Parent Defendants each controlled and directed the employment practices, including the illegal pay practices, of each Subsidiary Defendant by directing the Subsidiary Defendants to follow the uniform pay practices of the Parent Defendants, which the Parents Defendants applied to all of their subsidiaries' employees.

108.     Accordingly, each Parent Defendant was a joint employer of each Subsidiary Defendant with respect to the employees of such Subsidiary Defendant.

109.     Specifically, the Parent Defendants required the Subsidiary Defendants to each utilize a proprietary time-keeping hardware and software system developed by another subsidiary[17] of Defendant ARLP, Matrix Design Group, LLC, as the exclusive means for these Subsidiary Defendants to record the time worked[18] and to determine the times for which the Subsidiary Defendants would pay for the work of the employees of the Subsidiary Defendants.

110.     Upon information and belief, Subsidiary Defendants were prohibited by the Parent Defendants from utilizing other time-keeping systems, and none of the Subsidiary Defendants used any time-keeping system other than the Matrix system mandated by the Parent Defendants.

111.     Defendant ARLP described its use throughout its mining operations (i.e., amongst all of its subsidiaries operating coal mines, including the Subsidiary Defendants) of the technology of Matrix Design Group, LLC in ARLP's 2018 annual report, a copy of which is attached hereto as Exhibit 2, stating as follows:

> Our subsidiaries, Matrix Design Group, LLC ("Matrix Design") and its subsidiaries Matrix Design International, LLC and Matrix Design Africa (PTY) LTD, and Alliance Design Group, LLC ("Alliance Design") (collectively the Matrix Design entities and Alliance Design are referred to as the "Matrix Group"), provide a variety of mining technology products and services for our mining operations and certain industrial and mining technology products and services to third parties. Matrix Group's products and services include miner and equipment tracking systems and proximity detection systems. We acquired Matrix Design in September 2006.

---

[17]     Upon information and belief, as explained in § 9, Exhibit 21.1 to ARLP's 2018 Annual Report, a copy of which is attached hereto as Exhibit 2, Matrix Design Group, LLC is a wholly-owned subsidiary of Alliance Service Inc., which is in turn a wholly-owned subsidiary of Alliance Coal, LLC.

[18]     Although this was the exclusive method Defendants had to record the time worked by employees, it notably did not record all of the time worked.  Employees were required to don protective equipment, including the tracker device attached to the employee's helmet, and only after performing this work could utilize the timeclock-like device to "clock in."

112.    The technology provided by the entities described in the foregoing quotation (the "Matrix Entities") to the Subsidiary Defendants, as required by the Parent Defendants for the Subsidiary Defendants (and all other subsidiaries of the Parent Defendants with coal mining operations), included a tracking device technology that tracked, via a "tracker" device attached to each miner's helmet, the movements of each miner above and below ground.[19]

113.    Accordingly, the technology provided by the Matrix Entities to the Subsidiary Defendants enabled the Subsidiary Defendants to track the movements of each miner from the moment the miner retrieved his or her helmet from his or her locker or bucket.[20]

114.    Specifically, other tracking devices were located throughout each Mines facilities, including above-ground, and the tracking system the Parent Defendants required each Subsidiary Defendant to install automatically logged the exact time when each miner moved from the "bathhouse" above-ground area of each Mine to other above-ground areas of each mine.

115.    The Matrix Entities had the capability of utilizing the tracker device to automatically record in the Subsidiary Defendants' payroll system the time at which each worker's

---

[19]    Upon information and belief, Defendants implemented this tracking system and the "tracker" devices on each miner's helmet pursuant to the requirements of the Mine Improvement and New Emergency Response Act of 2006 and the tracking system described in the text of this Amended Complaint generally corresponds with the technology described in the Basic Tutorial on Wireless Communication and Electronic Tracking:  Technology Overview issued by the Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health, a copy of which is attached hereto as Exhibit 3.

[20]    Defendants utilized a bucket system under which, in lieu of providing an employee with a locker-room-style locker, each employee was assigned a particular bucket, which the employee could secure by hoisting the bucket up on a rope or chain until it was suspended in the air above the reach of other employees, at which time the rope or chain would be attached to an eye bolt and then secured by each employee attaching a lock personal to the employee, to which only the employee had a key.  In this way, personal items, including cash, could be stored by the miner during the period the miner was working underground by placing the items in the bucket and raising them up in the air in the bathhouse facility so that other miners could not access the contents of the bucket.  Also, protective clothing and equipment to be used by the miner underground, but which the miner was instructed not to take home, would be stored in the bucket by the miner at the end of each shift.  Specifically, helmets, each of which was assigned to and only used by one miner, were stored by miners in the bucket, unavailable to other employees, during times when employees were at home.  Accordingly, as discussed in the text, the tracking system detecting movement of the tracker attached to an employee's helmet indicated that the employee in question was physically present and had lowered the bucket and retrieved his or her helmet and was moving around the facility.

"tracker" device began moving, so that the Subsidiary Defendants could begin paying the worker from that time (if it was not already paying the worker at that time), but intentionally chose not to have the tracker be so utilized by the Subsidiary Defendants.

116.    Instead, the Matrix Entities provided timeclock-like devices to each subsidiary Defendant (and all other subsidiaries of the Parent Defendants which operated coal mines) and directed the Subsidiary Defendants to have their respective employees wave the tracker device attached to their helmet under the time clock-like device for the purpose of "clocking in" to register the fact that the employee was present.

117.    However, although the system was capable of and, upon information and belief, did record the exact time when each employee would was his or her helmet under the timeclock-like device to "clock in," the Parent Defendants instructed the Subsidiary Defendants to not begin paying each of the Subsidiary Defendants' respective employees at the time the employee "clocked in" using the time clock-like device, and to instead to set their system to automatically begin paying the employees at a later "start of shift" time, provided that the employee had "clocked in" by that time.

118.    Each Subsidiary Defendant followed these instructions and cooperated with the Matrix Entities installing time-keeping systems with each Subsidiary Defendant designed to pay the employees only from an arbitrary "start of shift" time, despite the fact that the technology installed by the Matrix Entities was expected to, and did, regularly detect that workers were performing work prior to that time.

119.    In addition to the Parent Defendants' control and joint employer status being demonstrated by the fact that each Subsidiary Defendant installed the same tracking system and timekeeping system provided by another of the Parent Defendants' subsidiaries (the Matrix

Entities), and by the fact that each chose in the same way to willfully ignore the data generated by that system regarding work being performed prior to the scheduled beginnings of shifts and to instead pay workers only from the scheduled beginning of the shifts, the data available to each Subsidiary Defendant through that system also indicates that the Parents Defendants were joint employers with each Defendant.

120.    Specifically, the time-keeping system installed by the Matrix Entities with each of the Subsidiary Defendants to record the amount of time which the Subsidiary Defendants chose to pay the workers recorded information in a centralized system containing information for each of the Subsidiary Defendants in one location, under the control of the Parent Defendants.

121.    Upon information and belief, data was recorded in this centralized system for each subsidiary of the Parent Defendant which operated coal mining operations, including each Subsidiary Defendant but also including other subsidiaries.

122.    Management at a mine operated by one of the Subsidiary Defendants could access the records showing the amount of time which an employee was credited with working at a different subsidiary of the Parent Defendants which operated a coal mine, even if the  worker in question did not work for the Subsidiary Defendant where the access to information was being made.

123.    For example, management at the Dotiki mine operated by Webster County Coal, LLC was able through the centralized database to access, and did in fact access, information regarding an employee who worked for Hamilton County Coal, LLC, an Alliance Coal, LLC subsidiary that runs mining operations in Illinois, even though that employee was not an employee of Webster County Coal, LLC (and was instead an employee of Hamilton County Coal, LLC) and did not perform at the Dotiki mine or as a nominal employee of Webster County Coal, LLC any

of the work for which time was recorded in the centralized database (and was being accessed by Webster County Coal, LLC management).

124.    Further, upon information and belief, each Parent Defendant directed each Subsidiary Defendant to tell its employees that the employee could retrieve information regarding his or her pay through a centralized "employee portal" maintained on a website of Defendant ARLP, and each Subsidiary Defendant complied with these directions.

125.    Specifically, Defendant ARLP maintains a website located at "www.arlp.com".

126.    A copy of that website, as it existed on January 15, 2020, is attached hereto as Exhibit 4.

127.    The website contains a link to an "Employee Portal."

128.    Persons who click the link to the "Employee Portal" are directed to another website page maintained by Defendant ARLP within the www.arlp.com domain, a copy of which, as it existed on January 15, 2020, is attached hereto as Exhibit 5 (the "Employee Portal Website Page").

129.    The Employee Portal Website Page provides links for "Human Resources," "Payroll" and "Raymond D. Wells, PSC."

130.    Persons selecting the link on the Employee Portal Website Page for "Payroll" are directed to an Ultipro Website, a copy of which, as it existed on January 15, 2020, is attached hereto as Exhibit 6.

131.    Upon information and belief, each of the Parent Defendants contracts with Ultimate Software,[21] the makers of the Ultipro Software, to provide payroll services to each of the Subsidiary Defendants relating to the employees of such Subsidiary Defendants, including

---

[21]    In the alternative, upon information and belief, each of the Parent Defendants directs each of the Subsidiary Defendants to contract with Ultimate Software for Ultimate Software to provide such services directly to such Subsidiary Defendants, and, as directed, each of the Subsidiary Defendants does so contract with Ultimate Software.

preparing direct deposits and electronic "paystubs" available to such employees on the Ultipro web portal.

132.    Upon information and belief, in performing its payroll services, Ultimate Software uses the information regarding the amount of time with which each Subsidiary Defendant employee should be credited with having worked generated by the proprietary tracking and timekeeping system developed and installed by the Matrix entities.

133.    Indeed, upon information and belief, all payroll services are provided by the Parent Defendants utilizing the information regarding the amount of time with which each Subsidiary Defendant employee should be credited with having worked generated by the proprietary tracking and timekeeping system developed and installed by the Matrix entities, and was processed in the same manner for employees of each of the Subsidiary Defendants.

134.    Persons selecting the link on the Employee Portal for "Human Resources" are directed to a site relating to Human Resources concerns applicable in common to all employees of the Subsidiary Defendants, as well as all employees of other subsidiaries of the Parent Defendants, a copy of which site, as it existed on January 23, 2020, is attached hereto as Exhibit 7.[22]

135.    Persons selecting the link on the employee portal for "Raymond D. Wells P.S.C." are directed to a website of a medical practice which provides medical services to employees of all of the Subsidiary Defendants and employees of numerous other subsidiaries of the Parent

---

[22]    That the website's Human Resources page and reference to "employee" in connection with its "Employee Portal" refers not only to employees of Defendant ARLP (the entity which owns and maintains the website), but also the employees of subsidiaries of ARLP, including employees of the Subsidiary Defendants, is indicated by the fact that the Human Resource page bears the logo and name not of ALRP, but of its subsidiary, Alliance. Similarly, upon information and belief, the picture above the "payroll link" on the employee portal depicts a flag flying underneath the American flag which is a flag not of Defendant ARLP or Alliance, but of one of the subsidiaries of Alliance which performs coal mining operations, suggesting Defendants' own conflation of its entities for purposes of administering employees' payroll. Further, the link to "Human Resources" displays a picture of a man wearing a uniform with the logo (and name) of River View Coal, LLC (a copy of this picture, as it appears on the Employee Portal, is attached as Exhibit 5, and the picture, by itself, is attached as Exhibit 8). However, the allegation in the text is not based merely on these facts.

Defendants. A copy of that website, and, specifically, the "about us" page which can be reached through the link on the Employee Portal, as it existed on January 15, 2020, is attached hereto as Exhibit 9, and states that "Raymond D. Wells PSC is the exclusive provider of on-site medical services to all Alliance Coal employees," and further lists "locations" for the provider, including "Dotiki," "River View 1," "River View 2" and "Warrior."

136.    In addition to maintaining identical payroll practices using proprietary time keeping technology developed by a sister entity, and maintaining universal employee information databases held and controlled by the Parent Defendants, the Parent Defendants' control over the Subsidiary Defendants' pay practices is also shown by the Subsidiary Defendants' use (directed by the Parent Defendants) of identical documents to provide policies to, or about, each Subsidiary Defendants' nominal employees.

137.    Specifically, upon information and belief, the employee handbooks issued by each Subsidiary Defendant are essentially identical.

138.    Further, rather than even attempt to appear to create documents specific to a particular Subsidiary Defendant, the Subsidiary Defendants often issued to employees documents containing policies of the Parent Defendants, rather than of the Subsidiary Defendants.

139.    For instance, when employees were transferred from the Dotiki Mine to Warrior Coal, LLC upon the closure of the Dotiki Mine in 2019 were given an orientation packet related to their new work as a nominal employee of Warrior Coal, LLC, Warrior Coal, LLC included in the packet Alliance Coal, LLC's Policy Statement on Conflicts of Interest and Irregularities, a copy of which is attached hereto as Exhibit 10.

140.    This document specifically states that it is applicable to the employees of "Alliance Coal, LLC and its subsidiaries and affiliates."

141.    Upon information and belief, each Parent Defendant regularly directs each Subsidiary Defendant to hire and fire employees, and otherwise performs Human Resource functions (including discipline) with respect to the employees of each Subsidiary Defendants.  In the alternative, each Parent Defendant on occasion directs each Subsidiary Defendant to hire and fire employees, and otherwise performs Human Resource functions (including discipline) with respect to the employees of each Subsidiary Defendant.  In the second alternative, each Parent Defendant retains the authority to hire and fire employees of each Subsidiary Defendant and to otherwise perform Human Resource functions (including discipline), and forces such Subsidiary to acknowledge such authority, even if it is not exercised by a particular Parent Defendant with respect to a particular Subsidiary Defendant.

142.    Defendant ARLP described itself and its subsidiaries, including Defendant Alliance Coal, LLC and the Subsidiary Defendants, as being part of the same company for purposes of their annual report and described transactions amongst the Defendants as "intercompany transactions."

143.    Specifically, Defendant ARLP specifically refers to employees of the Subsidiary Defendants as its employees and to the operations of the Subsidiary Defendants as its own operations.  See Exhibit 2 at 9 ("as of December 31, 2018, we had 2,331 employees, and we operate five active mining complexes in Illinois Basin") and 31 ("to conduct our operations, as of December 31, 2018, we employed 3,599 full time employees, including 3,212 employees involved in active mining operations….").[23]

---

[23]    Defendant ARLP stated as follows in its 2018 annual report, a copy of which is attached hereto as Exhibit 2, at 84-86:

References to "we," "us," "our" or "ARLP Partnership" mean the business and operations of Alliance Resource Partners, L.P., the parent company, as well as its consolidated subsidiaries.

144.    In addition to referring the employees of the Subsidiary Defendants' mining

operations as its own employees, Defendant ARLP has similarly referred to those mining

---

…

The Delaware limited partnership, limited liability companies and corporation that comprise our subsidiaries, giving effect to the subsequent events discussed in Note 23 – Subsequent Events, are as follows: Intermediate Partnership; Alliance Coal; Alliance Design Group, LLC ("Alliance Design"); AHGP; Alliance Land, LLC; Alliance Minerals, LLC ("Alliance Minerals"); Alliance Resource Properties; Alliance Resource Finance Corporation ("Alliance Finance"); AllDale Minerals, LP ("AllDale I"), AllDale Minerals II, LP ("AllDale II") (collectively, "AllDale I & II"); Alliance Royalty, LLC; AllRoy GP, LLC; ARM GP Holdings, Inc.; AROP Funding, LLC ("AROP Funding"); ARP Sebree, LLC ("ARP Sebree"); ARP Sebree South, LLC ("ARP Sebree South"); Alliance WOR Properties, LLC; Alliance Service, Inc. ("ASI"); Backbone Mountain, LLC; Cavalier Minerals JV, LLC ("Cavalier Minerals"); CavMM, LLC; CR Services, LLC ("CR Services"); CR Machine Shop, LLC ("CR Machine Shop"); Gibson County Coal, LLC ("Gibson County Coal"); Hamilton County Coal, LLC ("Hamilton"); Hopkins County Coal, LLC ("Hopkins County Coal"); Matrix Design Group, LLC ("Matrix Design"); Matrix Design International, LLC; Matrix Design Africa (PTY) LTD; MC Mining, LLC ("MC Mining"); Mettiki Coal, LLC ("Mettiki (MD)"); Mettiki Coal (WV), LLC ("Mettiki (WV)"); Mid-America Carbonates, LLC ("MAC"); MGP II, LLC ("MGP II"); Mt. Vernon Transfer Terminal, LLC ("Mt. Vernon"); New AHGP GP, LLC; Penn Ridge Coal, LLC ("Penn Ridge"); Pontiki Coal, LLC ("Pontiki"); River View Coal, LLC ("River View"); Rough Creek Mining, LLC; Sebree Mining, LLC ("Sebree"); Steamport, LLC; Tunnel Ridge, LLC

("Tunnel Ridge"); UC Coal, LLC ("UC Coal"); UC Mining, LLC ("UC Mining"); UC Processing, LLC ("UC Processing"); Warrior Coal, LLC ("Warrior"); Webster County Coal, LLC ("Webster County Coal"); White County Coal, LLC ("White County Coal"); WOR Land 6, LLC and Wildcat Insurance, LLC ("Wildcat Insurance").

….

Presentation

The consolidated financial statements include the accounts and operations of the ARLP Partnership and present our financial position as of December 31, 2018 and 2017, and results of our operations, comprehensive income, cash flows and changes in partners' capital for each of the three years in the period ended December 31, 2018. All of our intercompany transactions and accounts have been eliminated.

operations as its own mining operations in publicly released press statements.  See press release dated January 13, 2020, a copy of which is attached hereto as Exhibit 11 ("ARLP currently produces coal from seven mining complexes it operates in Illinois, Indiana, Kentucky, Maryland and West Virginia").

145.    Upon information and belief, in addition to exercising authority to hire, fire, discipline, and otherwise exercise payroll, scheduling and human-resources-related control over employees of the Subsidiary Defendants, including as discussed above, the Parent Defendants also exercised control over the pay rates and insurance benefits provided by the Subsidiary Defendants to their nominal employees.

146.    Further, in addition to supervising employees' hiring, firing, pay, and insurance, the Parent Defendants also supervised the actual work performed by the nominal employees of the Subsidiary Defendants.  For instance, the Subsidiary Defendants would receive directions from the Parent Defendants regarding how its workers should perform mining operations and in what direction workers should mine for coal, etc.

147.    To be clear, upon information and belief, Plaintiffs allege that the Parent Defendants expressly supervise and control the Subsidiary Defendants' requirement that Plaintiffs and others similarly-situated must come to work early and be "dressed and ready" fifteen minutes prior to the scheduled shift beginning and that the Subsidiary Defendants not pay Plaintiffs for this work but instead only pay Plaintiffs from the time of the scheduled beginning of their shift.

148.    Upon information and belief, the Parent Defendants further direct, supervise and control that the Subsidiary Defendants' pay to the Plaintiffs and those similarly-situated not include in the calculation of the overtime rate of pay any amount on account of bonuses paid

149.    Upon information and belief, the Parent Defendants further direct, supervise and control that the Subsidiary Defendants engage in the other violations alleged above with respect to the pay of Plaintiffs and those similarly situated.

150.    Further, upon information and belief, despite the employees being nominal employees of the Subsidiary Defendants, the Parent Defendants maintain the employment records for Plaintiffs and those similarly situated, including (A) payroll records showing amounts paid, (B) time records showing times employees were credited by the Defendants with having worked and (C) the "second set of books" regarding the amount of time worked: the "tracker" data showing when employees were present and performing work, but not being paid.

151.    Upon information and belief, the Parent Defendants share common management amongst themselves and with the Subsidiary Defendants, and, upon information and belief, management at the Subsidiary Defendants is told that such positions are considered a stepping stone to more-desirable and higher-paying positions management in the Parent Defendants entities, and, accordingly, management of the Subsidiary Defendants is closely aligned with, and attempt to comply in all respects with the directives of, management of the Parent Defendants.

152.    Indeed, the Parent Defendants act directly and indirectly in the interest of an employer in relation to the employees of the Subsidiary Defendants, including the Plaintiffs and those similarly situated, receiving all of the benefit of the work of the employees despite the work being nominally entitled as having been performed for a particular Subsidiary Defendant.

153.    Notably, the Parent Defendants are aware that the employees of each Subsidiary Defendants are economically dependent upon the Parent Defendants because if any employee refuses to comply with the Subsidiary Defendant rules propounded by the Parent Defendants that employees report to work so as to be "dressed and ready" fifteen minutes prior to their shift and

instead arrives and begin performing donning work only at the scheduled beginning time of their shifts, miners will not be able to "drop in" to mines on the schedule the Parent Defendants insist the Subsidiary Defendants follow.

154.    Delaying "drop in" delays production, which is viewed by Defendants as a serious offense and may be the basis for termination of an employee.

155.    Since employees terminated by any one of the Subsidiary Defendants would, upon information and belief, not be subject to rehire any of the Subsidiary Defendants because the Parent Defendants prohibits Subsidiary Defendants from hiring employees terminated by another Subsidiary Defendant, and because the Parent Defendants' subsidiaries mines are, in aggregate, a very large proportion of the base of coal mining jobs which would be available to such employees, the Parent Defendants are by means of their control of the Subsidiary Defendants able to largely engage in the violations described herein without fear of repercussion.

156.    The Parent Defendants' directions to the Subsidiary Defendants to engage in the violations described herein were not mere suggestions or recommendations, but were mandatory directions with which the Subsidiary Defendants were required to comply, and with which the Subsidiary Defendants therefore did comply.

157.    Stated another way, the decision of the Subsidiary Defendants to engage in the practices of requiring employees to come in and be "dressed and ready" prior to the scheduled beginning of their shift and to not pay appropriate overtime compensation based on bonus compensation provided and to otherwise to engage in the violations described above, was not discretionary on the part of the Subsidiary Defendants.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

158.    Plaintiffs bring this action under the FLSA on behalf of themselves and all similarly-situated current and former employees of Defendants who worked for Defendants and were not fully-paid for their overtime work which Defendants should have paid within the last three years.

159.    Stated another way, Plaintiffs seek to bring this action as a collective action under the FLSA on behalf of the following persons:

> all current and former employees of Webster County Coal, LLC, River View Coal, LLC and/or Warrior Coal, LLC who were not fully-paid since November 2, 2016 for all overtime compensation due for such employee's work in one or more workweeks because the employer did not pay the employee (1) for time worked (or for reporting to work as requested by Defendants to be available to work) prior to scheduled shifts, or (2) overtime compensation due on account of bonus compensation, or (3) the full overtime rate of pay.

160.    The employment policies, practices and agreements of Defendants raise questions of fact common to the proposed collective group including:

   a.   whether Defendant has engaged in a pattern or practice of permitting or requiring Plaintiffs and members of the proposed collective group to work in excess of forty hours per workweek for the benefit of Defendants and without appropriate compensation, in violation of the FLSA;

   b.   whether Defendants have engaged in a pattern or practice of failing to keep accurate records showing all hours worked by Plaintiffs and members of the proposed collective group, in violation of the FLSA;

   c.   whether the conduct of Defendants was willful;

   d.   whether Plaintiffs and members of the proposed collective group are entitled to lost wages, liquidated damages and the other relief requested.

161.    The claims of Plaintiffs are similar to those of the members of the proposed collective group, in that Plaintiffs has been subject to the same conduct as members of the proposed collective group and Plaintiffs' claims are based on the same legal theory as members of the collective group.

162.    Plaintiffs' FLSA claims are maintainable as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b).

163.    Plaintiff Randy Branson's consent to join this action is attached to the initial Complaint in this matter as Exhibit 7 (Ct. Doc. 1-8).

164.    Plaintiff Daniel Cunningham's consent to join this action was previously filed with this Court as Ct. Doc. 14-1 and his Supplemental Consent to Become Party Plaintiff is attached hereto as Exhibit 12.

165.    Plaintiff Alton Joseph Newberry's Consent to Become Named Party Plaintiff is attached hereto as Exhibit 13.

**CLASS ACTION ALLEGATIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23 RELATING TO DEFENDANTS' VIOLATION OF THE KWHA**

166.    Plaintiffs bring this action under the KWHA on behalf of themselves and all similarly-situated current and former employees of Defendants who worked for Defendants and were not fully-paid for their overtime work for which for Defendants which Defendants should have paid within the last five years.

167.    Stated another way, Plaintiffs seek to bring this action as a class action under the KWHA on behalf of the following persons:

> all current and former employees of any Webster County Coal, LLC, River View Coal, LLC and/or Warrior Coal, LLC who were not fully-paid since November 2, 2014 for all overtime compensation due for such employee's work in Kentucky in one or more workweeks because the employer did not pay the employee (1) for time worked (or for reporting to work as requested by the employer to be available

to work) prior to scheduled shifts, or (2) overtime compensation due on account of bonus compensation, or (3) the full overtime rate of pay.

168.     Plaintiffs are members of the class they seek to represent.

169.     Defendants failed to pay Plaintiffs and the members of the class they seek to represent wages for work performed, as described herein, in violation of Kentucky law, including the Kentucky Wages and Hours Act.

170.     Under Kentucky law, employers are required to compensate employees for all of the time that those employees spend working, and for all overtime compensation earned by such employees.

171.     Accordingly, Defendants' refusal to pay Plaintiffs and the similarly-situated employees for all of the hours that Plaintiffs actually worked and Defendants' refusal to pay the full overtime compensation earned by Plaintiffs and the similarly-situated employees violated Kentucky law.

172.     The Rule 23 class is sufficiently numerous that joinder of all members is impractical, satisfying Federal Rule of Civil Procedure 23(a)(1). On information and belief, Defendant has employed more than one-thousand individuals in Kentucky who were subject to Defendant's illegal policies described above.

173.     All members of the Rule 23 Class share the same pivotal questions of law and fact, thereby satisfying Federal Rule of Civil Procedure 23(a)(2).  Namely, all members of the Rule 23 class share the questions of (1) whether Defendants paid them for all time worked; and (2) whether Defendants' failed to pay them the full amount of overtime compensation earned.

174.     The claims of Plaintiffs are typical of the claims of the Rule 23 Class, thus satisfying Federal Rule of Civil Procedure 23(a)(3).  Defendants' failure to pay Plaintiffs for all hours worked

was not the result of any circumstances specific to the Plaintiffs.  Rather, it arose from Defendants'

common pay policies, which Defendants applied generally to their employees.

175.    Plaintiffs will fairly and adequately represent and protect the interests of the Rule

23 Class.

176.    Further, Plaintiffs have retained competent counsel experienced in representing

classes of employees against their employers related to their employers' failure to pay them

properly under the law, thus satisfying Federal Rule of Civil Procedure 23(a)(4).

177.    By failing to pay Plaintiffs and similarly-situated employees for all hours worked,

and failing to pay employees the full amount of overtime compensation earned, Defendants have

created the circumstance under which questions of law and fact common to the Rule 23 Class

Members predominate over any questions affecting only individual members. Thus, a class action

is superior to other available methods for fair and efficient adjudication of this matter.

Accordingly, Plaintiffs should be permitted to pursue the claims herein as a class action, pursuant

to Federal Rule of Civil Procedure 23(b)(3).

## COUNT I – VIOLATION OF FLSA – NONPAYMENT OF OVERTIME COMPENSATION

178.    Plaintiffs incorporate by reference all preceding paragraphs as if the same were set

forth again fully at this point.

179.    Defendants have willfully violated the FLSA by engaging in a pattern or practice

(or patterns or practices) of:

a.    failing to keep accurate records showing all the time it permitted and/or required

Plaintiffs and members of the proposed collective action to work, from the first

compensable act to the last compensable act, which has resulted in the denial of

compensation at an overtime rate as required by the FLSA, for all time worked in excess of forty hours in a work week; and

b.   permitting and/or requiring Plaintiffs and members of the proposed collective action to perform integral and indispensable activities (work) in excess of forty hours in a work week, for the benefit of Defendant and without compensation at the applicable federal overtime rates.

c.   Failing to pay employees the full amount of overtime compensation earned.

180.   As a result of Defendant's violations of the FLSA, Plaintiffs and those similarly-situated to them suffered damages, including their lost overtime pay, for which they should be awarded compensatory damages, liquidated damages, and attorney's fees and other reasonable litigation expenses.

## COUNT II – VIOLATION OF KY. REV. STAT. ANN. §§ 337.275, ET SEQ BY NONPAYMENT OF WAGES.

181.   All previous paragraphs are incorporated as though fully set forth herein.

182.   Plaintiffs bring this claim on behalf of all members of the proposed Rule 23 Class.

183.   Kentucky state law requires that covered employees be compensated for every hour worked in a workweek. See KY. REV. STAT. ANN. §§ 337.275, *et seq.*.

184.   KY. REV. STAT. ANN. § 337.285 requires that employees receive overtime compensation "not less than one and one-half (1-1/2) times" the employee's regular rate of pay for all hours worked over forty in one workweek.

185.   During all times material to this complaint, Defendants were each a covered employer required to comply with the Kentucky Wage Statutes.

186.   During all times material to this complaint Plaintiffs and the Rule 23 Class were covered employees entitled to the protections of the KWHA.

187.     Plaintiffs, and the Rule 23 Class they seek to represent, are not exempt from receiving the KWHA's overtime benefits because they do not fall within any of the exemptions set forth therein. See KY. REV. STAT. ANN. § 337.285(2).

188.     Defendants have violated the KWHA with respect to Plaintiffs and the Rule 23 Class by, inter alia, failing to compensate them for all hours worked at their normal hourly rate (for time worked under forty hours per week) and at one and one-half their "regular rate" for all hours worked in a workweek in excess of forty hours.

189.     In violating the KWHA, Defendants acted willfully and with reckless disregard of clearly applicable provisions of the KWHA.

190.     Pursuant to the KWHA, including KY. REV. STAT. ANN. § 337.385, Defendants, because they failed to pay employees the required amount of wages and overtime at the statutory rate, must reimburse the employees not only for the unpaid wages, but also for liquidated damages in an amount equal to the amount of unpaid wages.

191.     Pursuant to the KWHA, including KY. REV. STAT. ANN. § 337.385, Plaintiffs and the Rule 23 Class are entitled to reimbursement of the litigation costs and attorney's fees expended if they are successful in prosecuting an action for unpaid wages.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that the Court:

A.     Issue process and bring Defendants before the Court;

B.     Authorize notice to issue to members of the proposed collective action and permitting similarly-situated persons a reasonable opportunity to join this litigation with respect to claims under the FLSA;

C.      Certify a class of similarly-situated employees whose rights were violated by Defendants under Kentucky law, and grant relief available under Kentucky law, including unpaid wages, liquidated damages, and attorney's fees and other litigation expenses, to the class;

D.      Empanel a jury for the trial of all issues of fact;

E.      Enter a judgment awarding Plaintiffs and similarly-situated persons joining this litigation damages from Defendant, including compensation for unpaid work time, compensation for unpaid overtime pay, interest, and liquidated or exemplary damages, in amounts to be proven at trial;

F.      Award Plaintiffs and similarly-situated persons joining this litigation all costs of litigation, including expert fees and attorneys' fees;

G.      Grant Plaintiffs and similarly-situated persons joining this litigation all costs of litigation and such other further and/or general relief, legal and/or equitable relief, to which they are entitled or which the Court otherwise deems appropriate.

Respectfully submitted,

/s/ Mark N. Foster
Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-1303
Mfoster@MarkNFoster.com
*Counsel for Plaintiffs*