UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:19-CV-00155-JHM-HBB

RANDY BRANSON;
DANIEL CUNNINGHAM; and
ALTON JOSEPH NEWBERRY
*On Behalf of Themselves &*
*All Others Similarly-Situated*                                        PLAINTIFFS

V.

ALLIANCE COAL, LLC;
WEBSTER COUNTY COAL, LLC;
ALLIANCE RESOURCE PARTNERS, LP;
ALLIANCE RESOURCE OPERATING PARTNERS, LP;
WARRIOR COAL, LLC; and
RIVER VIEW COAL, LLC                                                  DEFENDANTS

## MEMORANDUM OPINION
## AND ORDER

Before the Court is Defendants'—Webster County Coal, LLC, Warrior Coal, LLC, and

River View Coal, LLC—motion to compel individualized discovery (DN 256).   Plaintiffs—

Randy Branson, Daniel Cunningham, and Alton Joseph Newberry—filed a response in opposition

(DN 258), to which Defendants replied (DN 263).   Also before the Court is Plaintiffs' motion to

compel discovery (DN 257).   Defendants have responded (DN 259), and Plaintiffs have filed a

reply (DN 262).   These motions are now ripe for consideration.[1]

## NATURE OF THE CASE

This case was brought as a collective action pursuant to the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 *et seq.*, and a class action under the Kentucky Wages and Hours Act

("KWHA") (DN 1, p. 1; DN 23, p. 1).   Plaintiffs allege Defendants "systematically and willfully

---

1   The District Judge referred this matter, pursuant to 28 U.S.C. § 636(b)(1)(A), to the undersigned United States
Magistrate Judge for determination of all non-dispositive matters (DN 4).

failed to comply with the requirements of the FLSA and KWHA" (DN 1, pp. 2-3, 8-22; DN 23, p. 2).   Following the filing of the Complaint, Plaintiffs filed numerous consent documents from employees of a subsidiary or subsidiaries of Defendants who wished opt into the case and become Party-Plaintiffs (DN 7, 12-14, 18-22, 25, 28, 30, 36-38, 40, 45-46, 48-51, 58-60, 62-64, 70, 73-74, 77-79, 82, 86-101, 106-19, 122-25, 127, 134, 137, 151, 153, 175, 177-78, 180, 183, 185-87, 189, 192-93, 195, 199, 202, 204, 206, 210, 212-25, 232-33, 253); *cf.* (DN 229) (withdrawing opt-in consent for a Party-Plaintiff (DN 217-1, p. 2)).

Thereafter, Plaintiffs filed a motion for conditional class certification (DN 128).   On April 20, 2021, the District Judge entered a Memorandum Opinion and Order which granted Plaintiffs' motion and "conditionally certifie[d] an FLSA collective action of all individuals who worked as coal miners at the Dotiki, Warrior/Cardinal, and River View mines after May 19, 2017 and elect to opt into this action" (DN 167, p. 13).[2]   The Court found the two-step certification process discussed in Comer v. Wal-Mart Stores, Inc., 454 F.3d 544 (6th Cir. 2006), was better suited to allow the Court to determine whether opt-in plaintiffs were "similarly situated" (Id. at pp. 7-8). First, Plaintiffs were to make a modest showing that putative class members are "similarly situated" to Plaintiffs (Id. at p. 7).   This step "screen[s] out obviously deficient claims" (Id.). After discovery, "trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated[,]" as the court would then have "much more information on which to base its decision and, as a result, [it] employs a stricter standard."   Comer, 454 F.3d at 547 (quoting Morisky v. Pub. Serv. Elec. & Gas Co., 111 F.Supp.2d 493 (D.N.J. 2000)). Importantly, at this stage, "certification is conditional and by no means final."   Id. at 546.

---

2   Branson v. Alliance Coal, LLC, No. 4:19-CV-00155-JHM, 2021 WL 1550571, at *7 (W.D. Ky. Apr. 20, 2021).

2

A month after the granting of conditional certification, the District Judge approved the parties' agreed opt-in notice form for distribution, approved the parties' agreed opt-in consent form, directed Defendants to deliver a list of all potential FLSA collective members to Plaintiffs, directed the dispersal of the notice documents, and directed that those putative members had sixty days from the date of the notice to join the case (DN 176).[3]   The sixty day period has expired, and a cumulative 526 individuals have opted-in as Party Plaintiffs in this action (DN 256, p. 5; DN 257-1, p. 2).[4]

After opt-in plaintiffs were added, discovery was set to begin on whether those that opted-in were "similarly situated" to Plaintiffs.   Discovery disputes and issues, however, brewed among the parties.   In an attempt to quell the disputes, the undersigned held a telephonic conference on February 16, 2022 (DN 250).   After speaking with the parties, the undersigned ordered the parties to provide a collaborative document which set forth each discovery issue between the parties and each parties' respective position on the issues (Id.).   This proved unfruitful, and the undersigned held a subsequent telephonic conference on March 2, 2022 (DN 255).   After speaking with the parties, the undersigned ordered that, no later than April 1, 2022, the parties shall file their respective motions to compel on the three discovery issues previously raised (Id.).

This Order has led to the present motions, which are discussed below.

---

3   Branson v. Alliance Coal, LLC, No. 4:19-CV-00155-JHM, 2021 WL 1996392, at *4 (W.D. Ky. May 18, 2021).

4   In Defendants' motion and in the response to Plaintiffs' motion, Defendants "expressly reserve the right to seek the exclusion of . . . 51 individuals as opt-in plaintiffs in this case" as those individuals filed their opt-in consent forms after the expiration of the sixty-day deadline (DN 256, p. 5 n.3; DN 259, p. 4 n.2) (citing DN 176, 215-25, 232, 234; Lynkins v. First Acceptance Corp., No. 3:13-cv-01374, 2015 U.S. Dist. LEXIS 64647, at *3 (M.D. Tenn. May 18, 2015)).   Defendants, however, use 526 opt-in plaintiffs for the motion and responses (Id.).

<u>DEFENDANTS' MOTION TO COMPEL (DN 256)</u>

Defendants' motion plainly iterates several points requested from the undersigned:

(1) Authorize Plaintiffs and Defendants to conduct individualized discovery of all individuals who submit affidavits or declarations in this case;

(2) Authorize Plaintiffs and Defendants to conduct statistically significant representative discovery regarding the opt-in plaintiffs at each mine;

(3) Allow Defendants to serve written discovery on 50 opt-in plaintiffs at each mine to be randomly chosen using a scientifically sound methodology by a statistician retained by Defendants and in such a manner that allows Plaintiffs transparency into the selection process;

(4) Allow Defendants to conduct remote depositions, each of which lasting no more than three (3) hours, of 50 opt-in plaintiffs at each mine, with 40 of the opt-in plaintiffs being randomly chosen using a scientifically sound methodology by a statistician retained by Defendants and in such a manner that allows Plaintiffs transparency into the selection process, and with 10 of the opt-in plaintiffs being chosen by Defendants; and

(5) Allow Defendants to seek leave from the Court to serve additional written discovery and/or to conduct additional depositions to the full number of opt-in plaintiffs constituting a statistically significant representative sample at each mine if it is determined that more information is needed.

(DN 256, pp. 2, 10-19).   For the first request, Defendants state that the District Judge relied upon ten individuals' declarations to grant conditional certification and request the ability to conduct individualized discovery and deposition discovery from them and from anyone else who has or will submit affidavits or declarations on behalf of Plaintiffs (<u>Id.</u> at pp. 1, 12).

As for the remaining points, Defendants advocate against a "simple comparative percentage analysis (<i>e.g.</i>, 10% of the entire class, etc.)" and instead seek a sample size of plaintiffs

4

which is more statistically significant (Id. at pp. 13-19).   Using a 95% confidence level and a 10%

margin of error, Defendants calculate that "the statistically significant sample size of the 185 opt-in

plaintiffs who worked at the Webster County Coal/Dotiki Mine is 64 opt-in plaintiffs.; the

statistically significant sample size of the 232 opt-in plaintiffs who worked at the Warrior/Cardinal

Mine is 69 opt-in plaintiffs; and the statistically significant sample size of the 229 opt-in plaintiffs

who worked at the River View Mine is 68 opt-in plaintiffs" (Id. at p. 14).   As a result, Defendants

would be seeking discovery from 201 individuals.   "[I]n the spirit of compromise and as a gesture

of goodwill," Defendants offer to limit written discovery to 50 opt-in plaintiffs per mine, leading

to a cumulative 150 opt-in individuals (Id. at p. 15).   If an individual was not to respond to the

discovery requests, Defendants argue that Rule 37 or Rule 41 measures to dismiss the individual

from the suit should be appropriate (Id. at pp. 16-18).

 In contrast, Plaintiffs oppose the "redundant written discovery and depositions last up to 3

hours each from each of the 160 of the miners[,]" as this discovery process would result in "close

to 500 hours of depositions, which does not even consider the hundreds of additional hours that

would be required in preparing for and scheduling those depositions, gathering and preparing

responses to Defendants' discovery requests, and searching for, compiling and producing

requested documents" (DN 258, pp. 1-2).   Instead, Plaintiffs seek "to limit the number of opt-ins

subject to discovery in this case to no more than 10% of the collective . . . and to make clear that

opt-ins who do not respond to discovery shall not be subject to dismissal from the case" (Id. at

p. 2).   Pushing back against Defendants' quest for "statistically significant" information, Plaintiffs

quote a finding from a sister district in this circuit which found that "courts do not apply a uniform

rule of statistical reasoning.   Rather, '[t]he fairness and utility of statistical methods … will

5

depend on facts and circumstances particular to those cases'" (<u>Id.</u> at pp. 11-12) (quoting <u>Sutton v. Diversity at Work Grp. Inc.</u>, No. 1:20-cv-00682, 2021 U.S. Dist. LEXIS 106904, at *6 (S.D. Ohio June 8, 2021) (quoting <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 577 U.S. 442, 460 (2016))).   Finally, Plaintiffs assert that "discovery [should] not [be] used as a tool to limit or discourage participation in the opt-in class" and Defendants' attempts to seek "excessive and onerous written discovery" is an attempt to reduce the size of the class (<u>Id.</u> at p. 18) (quoting <u>Fast v. Applebee's Int'l, Inc.</u>, No. 06-4146-CV-C-NKL, 2008 U.S. Dist. LEXIS 105159, at *5 (W.D. Mo. Dec. 31, 2008)).  Plaintiffs wish for the non-responsive respondent to be "skipped" and not be subject to dismissal from the class; instead, they would be replaced with another opt-in respondent (<u>Id.</u>).

DISCUSSION

In 1938, Congress enacted the FLSA, which created provisions for federal minimum wage, child labor protections, and, applicable here, overtime compensation requirements.   29 U.S.C. §§ 206, 207, 212.   In terms of overtime compensation, the FLSA denotes a forty-hour workweek cap for employees engaged in interstate commerce, "unless such employee receives compensation for his employment in excess of the hours . . . at a rate not less than one and one-half times the regular rate at which he is employed."   29 U.S.C. § 207(a)(1); *see also* KRS § 337.285.   To enforce such measures, two mechanisms are presented: (1) the Secretary of Labor initiates an FLSA action on behalf of employees; or (2) employees can initiate an FLSA action on "behalf of . . . themselves and other employees similarly situated."   29 U.S.C. §§ 216(b), 216(c); <u>Canaday v. Anthem Cos.</u>, 9 F.4th 392, 394 (6th Cir. 2021).   This second option is what has occurred here.   "Under the second option, . . . 'similarly situated' employees may join a collective action by filing a 'consent in writing,' after which they become 'party plaintiff[s]' . . . [and] enjoy party status as if they had

6

initiated the action." Canaday, 9 F.4th at 394 (citing 29 U.S.C. § 216(b)).   Unlike a FED. R. CIV. P. 23 class action, however, an FLSA collective does not provide "opt out" procedures. *See* Rogers v. Webstaurant, Inc., No. 4:18-CV-74-JHM, 2018 U.S. Dist. LEXIS 165262, at *3 (W.D. Ky. Sept. 25, 2018) ("A collective action under the FLSA permits similarly situated employees to 'opt-in' to the action, unlike the opt-out approach typically utilized under [Rule] 23.").

Since FLSA has been enacted, "courts have consistently praised the collective action as one of the most powerful tools in the effective resolution of FLSA claims and the promotion of judicial economy against the backdrop of an increasingly complex national economy." Canaday v. Anthem Cos., 9 F.4th 392, 415 (6th Cir. 2021) (citing Hoffmann-La Roche v. Sperling, 493 U.S. 165, 170 (1989) (explaining that by "lower[ing] individual costs to vindicate rights by the pooling of resources," Congress sought to encourage "efficient resolution [of FLSA claims] in one proceeding."); Bigger v. Facebook, Inc., 947 F.3d 1043, 1049 (7th Cir. 2020) ("The twin goals of collective actions are enforcement and efficiency: enforcement of the FLSA, by preventing violations of the overtime-pay requirements and by enabling employees to pool resources when seeking redress for violations; and efficiency in the resolution of disputes, by resolving in a single action common issues arising from the same alleged illegal activity."); Halle v. W. Allegheny Health Sys. Inc., 842 F.3d 215, 223 (3rd Cir. 2016) ("By permitting employees to proceed collectively, the FLSA provides employees the advantages of pooling resources and lowering individual costs so that those with relatively small claims may pursue relief where individual litigation might otherwise be cost-prohibitive.   It also yields efficiencies for the judicial system through resolution in one proceeding of common issues arising from the same allegedly wrongful activity.")).

As the District Judge noted in his granting of conditional certification, "Before a court may authorize notice to prospective opt-in plaintiffs, it must 'consider whether plaintiffs have shown that the employees to be notified are, in fact, similarly situated'" (DN 167, p. 3) (quoting Comer v. Wal-Mart Stores, Inc., 454 F.3d 544, 546 (6th Cir. 2006)).   The "similarly situated" inquiry requires the court to analyze several factors, many of which require discovery. *See* O'Brien v. Ed Donnelly Enters., Inc., 575 F.3d 567, 585 (6th Cir. 2009) (outlining the "similarly situated" factors), *abrogated on other grounds by* Campbell-Ewald Co. v. Gomez, 577 U.S. 153 (2016). Conditional certification was utilized to allow for a later determination on final certification to "examine more closely the question of whether particular members of the class are, in fact, similarly situated."   Comer, 454 F.3d at 547.

This later "final certification" is why the sum of the discovery at issue today is of importance.   Opt-in plaintiffs, at this stage, have been included provided that a "modest factual showing" has been made that their "position is similar, not identical to the positions held by the putative class members" (DN 167, pp. 3-4, 7) (quoting Comer, 454 F.3d at 546-47).   After discovery on this issue concludes, if the opt-in plaintiffs are not, in fact, "similarly situated," then those persons are excluded from the class or decertification may occur.   *See* Monroe v. FTS USA, LLC, 860 F.3d 389, 397 (6th Cir. 2017) (citing Comer, 454 F.3d at 546).

But how much discovery is necessary to determine whether the opt-in plaintiffs are "similarly situated"?   The parties have planted their flags in two diametrically different camps. Defendants seek discovery from 150 opt-in plaintiffs, representing a "statistically significant" number of individuals (DN 256, pp. 18-19), while Plaintiffs instead seek to limit discovery to 10% of the opt-in plaintiffs, approximately 52 individuals (DN 258, p. 8).

The Sixth Circuit has previously recognized that "representative testimony from a subset of plaintiffs [can] be used to facilitate the presentation of proof of FLSA violations, when such proof would normally be individualized." Monroe, 860 F.3d at 407 (quoting O'Brien v. Ed Donnelly Enters., 575 F.3d 567, 585 (6th Cir. 2009)) (alteration in original). In Monroe, the Sixth Circuit also documented how "[o]ur sister circuits overwhelmingly recognize the propriety of using representative testimony to establish a pattern of violations that include similarly situated employees who did not testify." Id. at 408-09 (collecting cases). Moreover, "limiting discovery to a statistically significant representative sampling . . . will both reasonably minimize the otherwise extraordinary burden imposed on the plaintiffs and their counsel and yet afford the defendant a reasonable opportunity to explore, discover and establish an evidentiary basis for its defenses." Smith v. Lowe's Home Ctrs., 236 F.R.D. 354, 357-58 (S.D. Ohio 2006).

"The analysis of a sample or subgroup is a commonly used scientific method of efficiently drawing inference about a larger population[, and] . . . [t]he sample is *representative* of the larger population only when it is chosen using sound methods[.]" Andreas-Moses v. Hartford Fire Ins. Co., 326 F.R.D. 309, 318 (M.D. Fla. 2018) (emphasis in original). "A representative or statistical sample, like all evidence, is a means to establish or defend against liability. Its permissibility turns not on the form a proceeding takes – be it a class or individual action – but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 454-55 (2016) (citing FED. R. EVID. 401, 403, 702). However, "[t]he fairness and utility of statistical methods . . . will depend on facts and circumstances particular to those cases." Id. at 460. "[T]here is no bright line formulation that mandates reversal when the sample is below a percentage threshold[, and i]t is axiomatic that

the weight to be accorded evidence is a function not of quantity but of quality . . . ."   Reich v. S. New Eng. Telecomms. Corp., 121 F.3d 58, 67-68 (2d Cir. 1997) (citing Sec'y of Labor v. DeSisto, 929 F.2d 789, 793 (1st Cir. 1991) ("[T]here is no ratio or formula for determining the number of employee witnesses required to constitute a representative sample of employees; the adequacy of the representative testimony necessarily will be determined in light of the nature of the work involved, the working conditions and relationships, and the detail and credibility of the testimony.")).   Thus, Defendants' proposition of statistical significance is persuasive.

But what is the correct confidence level and margin of error is appropriate for statistical significance?   Defendants proffer parameters of 95% confidence and a 10% margin of error (DN 256, p. 14).   This appears consistent with FLSA caselaw from this circuit.   *See* Rosenbohm v. Cellco P'ship, No. 2:17-cv-731, 2019 U.S. Dist. LEXIS 122999, at *7-9 (S.D. Ohio July 24, 2019) ("Although Defendant's requested five percent margin of error is more precise than the ten percent margin of error established in the Magistrate Judge's order, the Magistrate Judge's decision to fix the margin of error at ten percent is in no way contrary to law.   . . .   That equates to a ninety-five percent confidence interval and ten percent margin of error."); Sutton v. Diversity at Work Grp. Inc., 2021 U.S. Dist. LEXIS 106904, at *5, *5 n.4, *12 (S.D. Ohio June 8, 2021) ("Assuming a 10% margin of error and a 95% confidence interval[,]" "17 plaintiffs are necessary to create a 'statistically significant' and representative sample.   . . .   While statistical significance is not the rule, the benefit of a statistically significant sample of 17 opt-in Plaintiffs is clear.").

While a statistically significant argument is persuasive, and utilized to an extent, the Court possesses the ability to "limit the scope of discovery to protect a party from unduly burdensome discovery requests."   Smith v. Lowe's Home Ctrs., 236 F.R.D. 354, 356 (S.D. Ohio 2006); *see*

*also* Adkins v. Mid-America Growers, Inc., 141 F.R.D. 466 (N.D. Ill. 1992) (discussing how discovery should be conducted on a class-wide basis in an FLSA class action, rather than on an individual basis, in light of the burden of such individualized discovery on plaintiffs' counsel). Thus, the Court will use statistical significance to an extent, but the Court will also reduce the number of opt-in plaintiffs subject to written discovery and/or depositions.  Plaintiffs' apprehension about the total length of time to complete 160 depositions—"close to 500 hours" according to Plaintiffs—is well taken, and, as Plaintiffs noted, this estimate does not consider any additional time for logistical aspects and preparation for the depositions (DN 258, p. 11). Moreover, this time consideration does not even account for any written discovery that would occur before depositions.   To put into perspective how monumental this potential time commitment could become, if parties were to prepare 3 hours for each 3-hour deposition (and not counting scheduling or other matters associated with setting up the depositions), this would become 960 hours, or 40 days.   Therefore, the Court will be utilizing statistically significance when determining the proper sample size for representative discovery, but the sample size will be reduced from the size provided by Defendants.

As such, the Court finds that **the parties shall conduct individualized discovery on all opt-in plaintiffs who submit affidavits or declarations in this case.   This includes written discovery and/or depositions.**  While Plaintiffs seek to include the affiants/declarants into a collective group of persons who may be randomly selected to be subject to written discovery and/or depositions, the Court is persuaded by Defendants' argument that when an affiant/declarant took an additional step to insert themselves into the case, they "can be reasonably expected to be subject to discovery regarding the statements" (DN 256, p. 12) (citing Prime Gas, Inc. v. City of

11

Sacramento, 184 Cal. App. 697, 710 (Cal. App. 2010)).   Moreover, Plaintiffs have not addressed the idea of the affiants/declarants being separate from the group of the opt-in plaintiffs, but only that the concept of individualized discovery as to all opt-in plaintiffs is too voluminous (DN 258, pp. 8-11).  **These affiants/declarants are deemed independent from the number of opt-in plaintiffs who shall randomly selected to be subject to written discovery and/or depositions**, discussed below.

Turning to the opt-in plaintiffs who have not submitted an affidavit or declaration, the Court finds that **written discovery shall be limited to 100 opt-in plaintiffs**.  In Defendants' motion, Defendants noted that 185 opt-in plaintiffs worked at Webster County Coal/ Dotiki Mine, 232 opt-in plaintiffs worked at Warrior/Cardinal Mine, and 229 opt-in plaintiffs worked at River View Mine (DN 256, pp. 5, 14).  Curiously though, the sum of all these opt-in plaintiffs is 646, which is more than 100 individuals greater than the opt-in plaintiff class size.  Defendants clarify this curiosity by noting that 107 opt-in plaintiffs worked at two of the mines, while 5 opt-in plaintiffs worked at all three locations (Id. at p. 5 n.4).  In limiting the written discovery to 100 opt-in plaintiffs, the Court will still keep the proportion of opt-in plaintiffs at each mine to the sum including the overlapping employees.  Therefore, **29 opt-in plaintiffs shall be randomly selected from those that worked at Webster County Coal/ Dotiki Mine; 36 opt-in plaintiffs shall be randomly selected from those that worked at Warrior/Cardinal Mine; and 35 opt-in plaintiffs shall be randomly selected from those that worked at River View Mine.**

Even though this number of opt-in plaintiffs is less than what Defendants sought, the numbers above still provide for a 95% confidence level with a less than 10% accepted margin of error.  *See* Raosoft, *Sample Size Calculator*, http://www.raosoft.com/samplesize.html.  This is

12

almost the exact same data constraints proffered by Defendants (95% confidence level with 10% accepted margin of error), prior to their "show of good faith and goodwill" by limiting the volume of discovery (DN 263, p. 8), but the Court's calculation utilizes the cumulative group of opt-in plaintiffs and not calculating a new sample size for each individual mine.   Moreover, the Court's calculations would result in a lower accepted margin of error while still accounting for whether all opt-in plaintiffs are similarly situated, in addition to maintaining the proportion of employees at each mine to the three total mines.   In fact, this calculation also strikes a balance between the proffered solutions by the parties: Plaintiffs seeking 10% of all opt-in plaintiffs, while Defendants seek a statistically significant number from each individual mine.   The Court's calculations result in discovery from approximately 20% of the opt-in plaintiffs (while Defendants' initial proposition was closer to 30%) but the discovery would still remain statistically significant

Turning to the depositions that would follow the written discovery, **depositions shall be limited to 10 opt-in plaintiffs (who have not submitted an affidavit or declaration) from each mine**.   These 10 opt-in plaintiffs shall be randomly selected from the opt-in plaintiffs who were randomly selected (and completed written discovery) from each mine.   As for the length of the depositions, Plaintiffs (DN 258, p. 8) and Defendants (DN 256, p. 19) do not disagree on the 3-hour time constraint.   Not to create conflict where there is none, therefore, **the Court finds that each deposition will have a time limitation of 3 hours**.

Penultimately, a strong point of contention between the parties is the fate of opt-in plaintiffs who fail to respond to written discovery or depositions.   Defendants press that "[t]here is a wealth of authority supporting the traditional procedure" of providing Defendants the ability to "move to dismiss the FLSA claims of the opt-in plaintiff pursuant to Rule 37 or pursuant to Rule 41 for

failure to prosecute" (DN 256, pp. 16-17) (collecting cases).   Plaintiffs, on the other hand, argue that "discovery [should] not [be] used as a tool to limit or discourage participation in the opt-in class" (DN 258, p. 18) (quoting Fast v. Applebee's Int'l, Inc., No. 06-4146-CV-C-NKL, 2008 U.S. Dist. LEXIS 105159, at *5 (W.D. Mo. Dec. 31, 2008)) (alterations in motion).   Thus, Plaintiffs request that those who fail to respond are simply "skipped" and replaced with another (Id.).

**The Court finds that the opt-in plaintiffs who have been randomly selected, but fail or decline to participate in written discovery or depositions, are to be replaced with another opt-in plaintiff who is randomly selected.   Thereafter, Defendants possess the ability to move for dismissal of the FLSA claim by the non-responsive opt-in plaintiff.**   Plaintiffs will have the opportunity to respond to any motion for dismissal prior to a determination.

The Court is cognizant that dismissal under Rule 41 is a "harsh sanction" and "should only apply in extreme situations where there is a 'clear record of delay or contumacious conduct by the plaintiff.'"   Hanna v. Marriott Hotel Servs., No. 3:18-cv-00325, 2021 U.S. Dist. LEXIS 248561, at *5-6 (M.D. Tenn. Dec. 31, 2021).   The Sixth Circuit has also "discouraged involuntary dismissals without prior notice."   Rogers v. City of Warren, 302 F. App'x 371, 376 (6th Cir. 2008).   This move, however, may still be cognizable as a means of relief, as harsh as it may be, provided consideration of four primary factors.   Hanna, 2021 U.S. Dist. LEXIS 248561, at *5-6 (citing Schafer v. City of Defiance Police Dep't, 529 F.3d 731, 737 (6th Cir. 2008)).   A sister court within this circuit has also found that "[t]he *Schafer* factors favor dismissal with prejudice of those randomly selected opt-ins who provided no response to the questionnaire."   Rosenbohm v. Cellco P'ship, No. 2:17-cv-731, 2020 U.S. Dist. LEXIS 1361, at *6 (S.D. Ohio Jan. 6, 2020). "Further, to the extent responses were not provided due to counsel's inability to contact the opt-ins,

'[t]rial courts within this Circuit have agreed that an opt-in plaintiff's failure to respond to his counsel constitutes willful conduct weighing in favor of dismissal.'" Id. at *7 (quoting Hughes v. Gulf Interstate Field Servs., Inc., No. 2:14-cv-432, 2015 U.S. Dist. LEXIS 165043, at *2 (S.D. Ohio Dec. 9, 2015) (collecting cases), *adopted by* 2016 U.S. Dist. LEXIS 4792 (S.D. Ohio Jan. 14, 2016)).   In contrast, a court in this judicial district has previously dismissed opted-in plaintiffs *without prejudice* as a result of the plaintiff's failure to respond to their counsel's interrogatories and requests for production of documents.   Hathaway v. Shawn Jones Masonry, No. 5:11-CV-121, 2013 U.S. Dist. LEXIS 63374, at *4-5 (W.D. Ky. May 3, 2013).   Moreover, "a federal district court has the inherent power to dismiss a case *sua sponte* for failure to prosecute[.]"   Chambers v. NASCO, Inc., 501 U.S. 32 (1991) (citing Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962)).

Finally, the Court reiterates that these opt-in plaintiffs are to be selected *randomly*. Defendants suggest that roughly 80% of the opt-in plaintiffs should be randomly chosen and the remaining 20% should be specifically chosen "to account for gaps in the random selection process" (DN 256, pp. 18-19, p. 19 n.26).   This option, however, inherently eradicates the reliability of the data.  *See* Sutton v. Diversity at Work Grp. Inc., 2021 U.S. Dist. LEXIS 106904, at *4 (S.D. Ohio June 8, 2021) ("While random sampling is not a hard-and-fast rule in class-based discovery, courts have stood behind the proposition that a randomly selected sample helps reduce the likelihood of bias.   On the other hand, '[h]and-picking is almost certain to introduce a substantial amount of selection bias into the sample'" (quoting Hostetler v. Johnson Controls, Inc., No. 3:15-cv-226, 2016 U.S. Dist. LEXIS 89278 (N.D. Ind. July 11, 2016))); METTE L. BARAN & JANICE E. JONES, MIXED METHODS RESEARCH FOR IMPROVED SCIENTIFIC STUDY 119 (2016) (Purposive samples can be "prone to researcher bias because of its judgmental and subjective component[.]   The

15

subjectivity and non-probability based nature of unit selection . . . means that it can be difficult to defend the representativeness of the sample, it can be difficult to convince the reader that the judgment used to select units to study was appropriate and it can also be difficult to convince the reader that research using purposive sampling achieved theoretical/analytic/logical generalization."). Put simply, the inclusion of purposefully selected data questions whether the data accurately represents the population as a whole. To preserve the reliability of the discovery data, no party shall select certain opt-in plaintiffs from whom to collect information or depose.

In sum, the Court's findings above as enumerated as follows: (1) the parties shall conduct individualized discovery on all opt-in plaintiffs who submit affidavits or declarations in this case, including written discovery and/or depositions, and this individualized discovery shall not be included in the total number of opt-in plaintiffs discussed in later findings; (2) written discovery shall be limited to randomly selected 100 opt-in plaintiffs, not including those that submitted affidavits and/or declarations (29 from Webster County Coal/ Dotiki Mine; 36 from Warrior/Cardinal Mine; and 35 from River View Mine) ; (3) of the 100 opt-in plaintiffs above, 10 from each mine are to be randomly selected for depositions; (4) depositions taken pursuant to this discovery shall be limited to 3 hours each; and (5) if an opt-in plaintiff is non-responsive to the discovery requests, they are to be replaced with another opt-in plaintiff who is randomly selected, and Defendants may to move for dismissal of the FLSA claim by the non-responsive opt-in plaintiff.

## PLAINTIFF'S MOTION TO COMPEL (DN 257)

Related to Defendants' motion above, Plaintiffs filed a motion to compel seeking discovery from Defendants for "the electronic payroll and timekeeping records . . . and the Matrix Minor and

Equipment Tracking System records . . . for all Opt-In Plaintiffs, in addition to a 10% random sample of such Payroll/Timekeeping Records of the Kentucky Class who are not Opt-In Plaintiffs at each mine" (DN 257-1, p. 1) (emphasis omitted).   In a later footnote, Plaintiffs note that there are over 500 opt-in plaintiffs and "[t]he potential Kentucky Class includes more than 1,800 individuals" (Id. at p. 3 n.2).   Additionally, Plaintiffs seek "disciplinary records relating to attendance and/or tardiness, documents reflecting complaints about work hours, documents reflecting any agreement or contract between an Opt-In Plaintiff and a Defendant, sheets that record 'early-in/early out' entries, to the extent they exist for all Opt-In Plaintiffs during the time period November 2, 2014 to the present" (Id. at pp. 1-2).   When paired with Defendants' motion above, Plaintiffs assert that "the Court should reject Defendants' attempt to condition and 'link' any such production on Defendants' purported right to take 'reciprocal' discovery from every member of the potential class and collective" (Id. at p. 24).

Defendants, in contrast to Plaintiffs' arguments, propose that the discovery obligations be reciprocal and reiterates a stance for statistically significant representative sampling (DN 259, p. 8).   Defendants categorize Plaintiffs' view as "patently unfair" and an unsupported "one-sided, inequitable discovery procedure" (Id.).   Additionally, Defendants argue that Plaintiffs requests for electronic timekeeping records, electronic paystubs, certain personnel records, and the "Early In and Out Late" sheets "exceeds the scope of Rule 26" (Id. at pp. 11-16).

DISCUSSION

One quote cited by Defendants was particularly notable in the Court's decision-making: "Plaintiff cannot have it both ways.   Plaintiff cannot maintain that Defendants are limited to representative discovery while commanding of Defendants individualized discovery with respect

17

to the named Plaintiff and opt-in Plaintiffs" (DN 259, pp. 8-9) (citing <u>Martin v. Flowers Foods</u>, No. 8:16-cv-3145-MSS-JSS, 2020 U.S. Dist. LEXIS 161467, at *17 (M.D. Fla. July 31, 2020)). This quote stuck out to the Court because it is inequitable for one party to be limited in size when seeking discovery while the other party is allowed full reign and class size when seeking their discovery.   Given the limitations regarding whom Defendants may seek discovery, a phrase also used repeatedly in the cases cited by Defendants is also applicable: "what is good for the goose is good for the gander" (<u>Id.</u> at pp. 8-9) (citing <u>Stafford v. Bojangles Rests., Inc.</u>, No. 3:20-cv-266-MOC, 2021 U.S. Dist. LEXIS 207978, at *4-5 (W.D. N.C. Oct. 28, 2021); <u>Walker v. Alta Colleges, Inc.</u>, No. A-09-CV-894-LY, 2010 U.S. Dist. LEXIS 67153, at *23 (W.D. Tex. July 6, 2010)).

Ultimately, the Court finds that the discovery sought by Plaintiffs should be reciprocal to that which is provided to Defendants.   **Therefore, Defendants shall turn over the requested discovery as it relates to the opt-in plaintiffs who have submitted an affidavit and/or declaration, in addition to the 100 randomly selected opt-in plaintiffs who will be subject to written discovery**, consistent with the Courts findings above.   Defendants, however, are not required to turn over the requested discovery for opt-in plaintiffs who are not subjected to the written discovery.   Moreover, to the extent Plaintiffs are seeking documentation related to non-opt-in persons, Defendants are not required to produce such documentation at this time.

If, after conducting the discovery of the representative sample, either party can demonstrate to the Court that broader discovery is appropriate and necessary, the parties can so move.   *See* <u>Smith v. Lowe's Home Ctrs.</u>, 236 F.R.D. 354, 358 (S.D. Ohio 2006).   If broader discovery is granted for one party, the opposing party will also receive reciprocal to the request – *e.g.*, if Defendants seek additional written discovery from other opt-in plaintiffs, and that request is

granted, Defendants must then also produce the requested discovery in Plaintiff's motion to compel for the opt-in plaintiffs who are selected.

DISCOVERY QUESTIONNAIRE (DN 263-1)

In Defendants' reply memorandum, Defendants include a sample discovery questionnaire and request for documents which would be sent to each of the selected opt-in plaintiffs (DN 263, p. 11).  This questionnaire "will allow Defendants to obtain information relevant to their FLSA defenses and to their decertification motion" (Id.).   Looking to "Defendants' Discovery Questionnaire and Request for Documents to Opt-In Plaintiffs", it contains areas for the recipient to fill in information regarding personal information, employment information, unpaid wage information, bankruptcy information, and communications about the present lawsuit (DN 263-1). This questionnaire also includes two attachments: the first requiring a detailed recitation for each position or job title held while working at one of the three mines from November 2014 to the present (Id. at pp. 6-8), and the second (only necessary if the individual had previously complained or raised concerns about work hours, timekeeping, meal breaks, and/or compensation) requiring an exhaustive list of each instance of complaints, to whom the complaint was raised, when, the contents of each interaction, and if anything came from the matter (Id. at pp. 9-10).   Additionally, the questionnaire requests copies of documents from November 2014 to the present that show: (1) the hours worked, (2) amount of compensation, (3) amount of compensation owed for pre- and post-shift work, (4) amount in bonuses received, (5) communications regarding the present lawsuit, and (6) a policy at any or all of the mines requiring workers to arrive 15 minutes or more prior to the start of their shift (Id. at p. 5).

19

Such an onerous, in-depth examination required of each opt-in plaintiff would entail the consultation of Plaintiffs' counsel to each of the opt-in plaintiffs. This advice would over-encumber Plaintiffs' counsel by attempting to satisfy each of these inquiries and requests for documents. Like above, the Court possesses the ability to "limit the scope of discovery to protect a party from unduly burdensome discovery requests." Smith v. Lowe's Home Ctrs., 236 F.R.D. 354, 356 (S.D. Ohio 2006). The Court would be more inclined to allow the questionnaire to remain as written if the questionnaire was presented earlier in motion practice. *See* Humphrey v. U.S. Att'y Gen. Off., 279 F. App'x 328, 331 (6th Cir. 2008) ("Thus, where, as here, plaintiff has not raised arguments in the district court by virtue of his failure to oppose defendants' motions to dismiss, the arguments have been waived."); Campbell v. McMinn Cty., No. 1:10-CV-278, 2012 U.S. Dist. LEXIS 13127, at *22 (E.D. Tenn. Feb. 3, 2012) ("Although Plaintiff had an opportunity to respond to these issues . . . Plaintiff completely avoided this issue in his response to Defendants' motion. . . . Plaintiff has effectively waived any objection to Defendants' arguments . . . ."). Instead, the questionnaire was filed alongside Defendants' reply memorandum; thus, Plaintiffs would not have an opportunity to address the questionnaire, absent filing for leave to file a surreply.

Therefore, **the parties are directed to meet and confer in order to pare down the questionnaire at DN 263-1**. The parties are to work together and create a questionnaire that could be completed without the assistance of Plaintiffs' counsel or, at a minimum, reduced assistance by counsel. After crafting a more suitable questionnaire, the parties are to submit it to the Court for final review and approval before being sent to the randomly selected opt-in plaintiffs. If no acceptable questionnaire can be drafted, the parties may be required to come before the Court in person and explain what is preventing the amicable crafting of the questionnaire.

<u>ORDER</u>

**WHEREFORE**, the Court finds as follows:

1.      **IT IS HEREBY ORDERED** that Defendants' motion to compel (DN 256) is **GRANTED IN PART** and **DENIED IN PART**;

2.      **IT IS FURTHER ORDERED** that Plaintiffs' motion to compel (DN 257) is **GRANTED IN PART** and **DENIED IN PART**;

3.      **IT IS FURTHER ORDERED** that individualized discovery shall be conducted on all opt-in plaintiffs who have submitted an affidavit or discovery, and their discovery will not be counted in the total number of opt-in plaintiffs below;

4.      **IT IS FURTHER ORDERED** that written discovery shall be conducted on **100 randomly selected opt-in plaintiffs**, consistent with the Court's findings above;

5.      **IT IS FURTHER ORDERED** that depositions shall be conducted on **30 of the randomly selected opt-in plaintiffs**, consistent with the Court's findings above;

6.      **IT IS FURTHER ORDERED** that Defendants shall provide Plaintiffs with the documentation requested in the motion to compel (DN 257), but only as to the opt-in plaintiffs who are subject to discovery, whether they be randomly selected or those that submitted an affidavit or declaration;

7.      **IT IS FURTHER ORDERED** that if, after conducting discovery pursuant to this Order, either party can demonstrate to the Court that broader discovery is appropriate and necessary, the party can so move; and

8.      **THE PARTIES ARE DIRECTED** to confer to revise the discovery questionnaire attached to Defendants' reply memorandum (DN 263-1), consistent with the Court's findings above.

*H. Brent Brennenstuhl*

**H. Brent Brennenstuhl**
**United States Magistrate Judge**

July 13, 2022

Copies:      Counsel of Record

21